**J. Paul SHELTON, Appellant,**

v.

**UNITED STATES of America, Appellee.**

No. 16354.

United States Court of Appeals
Fifth Circuit.

Feb. 27, 1957.

Petition for Rehearing en Banc Granted
April 3, 1957.

J. Paul Shelton, in pro. per.

James W. Dorsey, U. S. Atty., Charles D. Read, Jr., Asst. U. S. Atty., Atlanta, Ga., for appellee.

Before RIVES, TUTTLE and BROWN, Circuit Judges.

RIVES, Circuit Judge.

The appellant moved the court under 28 U.S.C.A. § 2255 to vacate a one year prison sentence imposed for violation of the Dyer Act, 18 U.S.C.A. § 2311 et seq., covering interstate transportation of a stolen motor vehicle. The motion was based on the ground that, without the assistance of counsel, the movant had entered a plea of guilty which was not in fact voluntary but was induced by various promises.[1] It alleged that the movant was not guilty of the offense charged, that he had gone through one trial on the charge before the same court which had resulted in a mistrial, and had consistently maintained his innocence.

An amendment to the motion alleged that the Government counsel had made additional promises,[2] that the movant would not have pleaded guilty had it not been for the aforementioned promises and inducements, charged in detail the respects in which it was claimed that Government counsel had not fulfilled his promises, and set forth an additional ground for relief.[3]

---

1. Thus listed in the motion:
   "(1) government counsel's promise to arrange for dismissal of all other federal charges, (2) government's counsel's 'guarantee' of a sentence of not more than one year in the instant case, (3) government's counsel's threat that it would take defendant longer to get tried on the other pending charges than it would take him to serve a one year sentence, and (4) defendant's confused, anxious, desperate, and incompetent state of mind resulting from prolonged confinement in county jails while awaiting trial as aforesaid."

2. That he "would personally and as soon as possible take the necessary steps to (a) have the warden of the Penitentiary notified that movant would not be wanted by federal authorities in St. Louis or El Paso upon his release from the penitentiary; (b) expedite return to movant of all property seized from him by federal agents in El Paso in January 1952, and have the property delivered, transportation charges prepaid, to any person in the United States designated by movant to receive the property; (c) interpose no opposition to any request movant might make, or any legal action he might institute, to obtain credit for approximately nine months spent in jail pending appeal from a four year sentence that had been imposed in New Orleans."

3. "The sentence should be vacated for the further reason that the Court, at time of

Upon the hearing on the motion, the movant testified at length in support of his averments. His testimony in part was that he had always maintained his innocence of the charge; he referred the court to the previous trial resulting in a mistrial, and testified,

"Your Honor wouldn't recall personally at this late date all that happened but in as much as part of my motion here is based on the fact I really am innocent of the charge, I would like to state this on the question of my guilt or innocence. The Government's charge was—

"Mr. Read: Your Honor, I would like to object to, and do object to any testimony along that line of his guilt or innocence. I believe from the law that is not an issue that can be brought in on the motion under 2255.

"The Court: No, Mr. Shelton, we can't retry the case, you appealed this case, did you not, to the Fifth Circuit Court? A. No, sir.

"The Court: You didn't? A. I will content myself with just saying that I wasn't guilty then.

"The Court: All right."

He further testified that the Assistant United States Attorney came to see him at the Federal Penitentiary while he was serving his previous sentence, and that they had the following conversation:

"I believe Mr. Breland was present part of the time, and Mr. Carter was present part of the time, the officials of the Penitentiary, and the conversation went something like this: 'Now, hell, Shelton, you know we have got you on this, the first

jury was going to convict you if we had not had a mistrial, so why don't you plead guilty and get this thing over,' and I reaffirmed my innocence of the charge, and I expressed a firm belief I would be acquitted, either by Your Honor without a jury, or with a jury. I believe I somewhat taunted him for having refused to go to trial before Your Honor without a jury. I asked him what he was afraid of, did he think he could flimflam a jury better than he could Your Honor. That was said in a jocular vein, of course and he said, 'Well, a jury will convict you, and if they don't convict you, you still will have to go down to Florida and be tried down there.' Well, the thought that went through my head then, I had a terrible vision of spending months down in the Miami jail, and I had gotten fed up with these county jails, and the Penitentiary, relatively speaking, is a paradise compared to the county jail. Well, I could not recall every word that was spoken, but the substance of the conversation between Mr. Tysinger and myself was this: Mr. Tysinger stated if I could, would, come down here and plead guilty, he would guarantee a sentence of one year—he said not a year and a day, a year. And he further stated that he would get the Miami indictment disposed of, and it would not be necessary for me to go to Miami, and he pointed out to me, even though I would be acquitted here, and even though I would be acquitted in Miami, I still would have to spend several months in jail await-

arraignment, did not comply with the mandatory requirement of Rule 11, Fed. Rules of Crim.Proc. [18 U.S.C.A.], which requirement is that the Court

"'shall not accept the plea without first determining that the plea is made voluntarily'

If the Court had complied with this Rule by asking movant whether his guilty plea was induced by promises, movant would have truthfully answered that it

was so induced and that it was contingent on certain conditions being met, notwithstanding the admonition Mr. Tysinger has admitted giving him just before he entered the courtroom, which admonition was to the effect that movant should 'not shoot off your month,' and should 'not do a lot of talking' to the judge, lest he 'ruin everything,' to the extent that the judge would not accept the plea of guilty."

ing trial, fighting the case. So I asked, well I deliberated on his proposition, and eventually I told him after we discussed the matter there for perhaps half an hour or so, I told him, I said, very well, if you can guarantee a sentence of one year, and if you will guarantee the dismissal of the Miami charge, I will plead guilty. And he said he would come back down here, and he would get in touch with the various persons necessary, and if he was able to do what he thought he could do, he would have me brought down as soon as possible and I could enter a plea of guilty. And I told him, very well, but I at no time admitted to him I was guilty, but on the contrary, I at all times stated I was innocent of this charge, and if I went to trial I expected to be acquitted of this charge, but as a matter of expediency I would take him up on the proposition, to avoid going down to Miami, spending many, many months."

The movant was cross-examined at length as to whether the promises which had been made to him by Government counsel had actually been fulfilled, and insisted that some of such promises had not been carried out.

He further testified that with good time allowance he was due to be released in a little more than three months, and, if his motion were granted and he were re-tried on the charge, he would be subject to a maximum penalty of five years if convicted, but that he wanted to take that chance.

The Government then introduced as a witness, on the hearing of the motion, the former Assistant United States Attorney who had handled the case against the movant. He testified that he went to see the movant in the penitentiary and that the following occurred:

"  *   *   * he stated he wanted to get all settled up, all straightened up with his law cases, and he wanted to dispose of them by withdraw-

ing his petition for certiorari in the Supreme Court of the United States, one of them, and by dismissing the indictment, nol prossing the indictment, lifting the detainer in Miami, Southern District of Florida, I asked him what he proposed to do, and he said he would take, he would like to get a sentence of five years, including the four year sentence in New Orleans, or a year and a day in addition to it, and the main part of the conversation was about withdrawing his petition for certiorari to the Supreme Court of the United States, and the nol prossing of the Miami indictment, and lifting that detainer. Now, I told him I couldn't do anything but recommend to the court about these, but if he, this is after he had the mistrial here in this court, and the—we had spent thousands of dollars of United States money, and I was trying to prosecute on that mistrial. In order to expedite justice and save the Government money, I told him I would recommend a year and a day, or five years, to end forever the litigating action on the part of the petitioner, and that was understood, and I come back and I did recommend to His Honor, whereupon I proceeded immediately to call the Attorney General of the United States, criminal division, called Mr. Gilmartin, U. S. Attorney in Miami, and I talked to the Assistant U. S. Attorney on several occasions, each one of them, and there wasn't nothing intended to be promised him, just recommendations, but everybody agreed, and he was brought in here, and entered a plea of guilty, and His Honor sentenced him to a year and a day to follow the four year sentence in New Orleans."

He further testified at some length as to the carrying out of the various understandings with the movant. The former Assistant United States Attorney was cross-examined by movant at length as

to the various promises and their fulfillment.[4]

The Government then introduced as a witness Mr. Samuel L. Carter, Record Clerk at the United States Penitentiary for the past fifteen years, who testified that the Assistant United States Attorney asked him to be present at his conversation with the movant preceding movant's plea of guilty. He then testified:

"Q. All right, sir. Now, in that interview, Mr. Carter, will you tell us as briefly as possible, what the substance of the conversation was between Mr. Tysinger, and the mov-

---

[4] A part of that cross-examination follows:

"Q. Do you think you could produce any written evidence from your record where you tried to make good on your promises to get the St. Louis and El Paso detainer off? Do you have anything in your record to show that? A. I don't remember now, you waited until I was out of office, retired, before you brought this thing so you knew I wouldn't have them, and that is the reason.

"Q. All right, the file is still intact, Mr. Tysinger? A. I don't know.

"Q. I notice you have letters from me dated way back in 1953. A. Mr. Read is in charge of it.

"Q. Then you don't know whether they have any records or not? A. I know I don't. I know I done my utmost in getting everything done and finally done through the Justice Department, the various agencies, and it was done, and do you have a detainer on you today of those you mentioned about the end of your sentence, do you have one on you?

"Q. No, Mr. Tysinger, but not because of your action. A. Do you make any accusation against me?

"Q. No, sir. A. Well,—

"Q. You have no written evidence? A. No, I got telephone calls there, I spent hundreds of dollars, at least a hundred dollars worth because I took you in good faith, Mr. Shelton, and so did this court.

"Q. Mr. Tysinger, isn't it a fact you did assure me before I entered the plea that you would get these detainers off, and would guarantee me a year sentence? A. Well, you got it.

"Q. Did you promise that? Answer yes or no. A. I told you I would recommend it, I worked on it.

"Q. You did make an offer? A. You asked for it. I said I would recommend it, I would do it in this eternal lengthy litigation that you had and you wanted it done.

"Q. And you deny that you ever asked, advised me that I should plead guilty and do this, you deny it? A. You are the one wanted to do it. I didn't have any—

you stood up here in this court, and acted as your own lawyer, and I thought—

"Q. I would like to ask you this question: Do you recall in the bullpen in the marshal's office just before I entered the plea of guilty that you came in there and told me something to this effect, 'now, Shelton, don't go in there and shoot your mouth off or the Judge may not take your plea.' Do you recall making that statement? A. I probably did. I don't deny that because you had done enough of it before when the mistrial was.

"Q. You were afraid if I told Judge Hooper that promises had been made he would not accept my plea? A. No.

"Q. Why did you say 'don't shoot your mouth off' before the judge? A. Well, you wanted a year, didn't you?

"Q. 'Or he might not accept your plea.' A. That's right, you wanted a year, didn't you, that was the answer to that.

\* \* \* \* \*

"Q. Now, do you have any recollection of my ever making an admission to you that I was actually guilty of this offense? A. You said you would plea guilty to one count.

"Q. I said I would plead guilty? A. Yes.

"Q. Did I not consistently deny my guilt and tell you that you could not convict me and did I not discuss the evidence with you and tell you that your main witnesses' story told it, I told you the respects in which I said it was false and how I would prove it was false? A. That was your opinion, Mr. Shelton, whether you would be convicted or acquitted, just your opinion.

"Q. What was your opinion, Mr. Tysinger? A. My opinion was that you would be found guilty on that count.

"Q. Yet, you were willing to go to an awful lot of trouble to get me to plead guilty and only get me one year when you thought you could convict me? A. And to end your everlastingly litigious actions.

"Q. You do recall that I told you I could go to trial and be acquitted, don't you recall that? A. That was your opinion. I have heard those ten thousand times."

ant, with relation to the disposition of this case on the matters that were brought up? A. Yes, sir. As well as I can, I will. Mr. Shelton had a sentence at that time of four years. He had been committed to Atlanta. He had a pending case in this court, and he had a pending case in the Southern District of Florida. And there were possibly cases at St. Louis, and I believe El Paso, Texas. And he stated that he was a little worried about the case in Florida. He didn't seem to be worried too much about the other cases, and that he wanted to dispose of it. And of course the case here in Georgia was a (sic) in the Northern District of Georgia was the first case to be disposed of. And I don't know how the agreement was arrived at, it seemed to me like it was mutually acceptable. Judge Tysinger, rather Mr. Tysinger, said he would use his good offices and recommendations that the Court give him one year, if he would plead guilty to this case on the Northern District of Georgia, that he would endeavor to get all the pending indictments, and the pending cases disposed of. And that in return Shelton would plead guilty up here in the, in this court, to the offense, and he would drop all his litigation. He had an appeal pending at that time, among other things, and he was going to drop all his pending litigation, and he would go ahead and serve the five years which would be the then total, and that would be all there was to it.

"Q. Five years, one to—A. With the one year he was expecting to get up here."

On cross-examination by the movant, Mr. Carter testified:

"Q. Mr. Carter, did you hear me make an admission that I was actually guilty of transporting a 1948 Lincoln automobile from Washington, D. C. to Atlanta, Georgia? Have you ever heard me admit such a thing? A. No.

\*　　\*　　\*　　\*　　\*

"Q. And this deal which Mr. Tysinger and I worked out, you say seemed to be mutually acceptable to each of us? A. It appeared to me that it was.

"Q. And did it appear to you that without those promises by Mr. Tysinger that I would have agreed to plead guilty? Did it appear to you that my plea was induced by promises to do these various things? A. I couldn't express any opinion on that. I don't know what induced you to plead guilty.

"Q. You do recall, I believe you did state, on direct examination you stated that I stated I would plead guilty if he did thus and so? A. That was my understanding.

"Q. If he did thus and so, I would plead guilty. A. Yes."

The movant resumed the stand in rebuttal and in response to questions by the court the following colloquy ensued:

"A. Now, with respect to my guilt or innocence on this charge, I want to once more make an offer of proof of innocence. I know Your Honor previously ruled the fact that it was not relevant, but I do want to make the offer of proof, and that for the record as to my innocence, and in connection with that there are cases which I have written down here, where the question of innocence or guilt was considered by the Court.

"Q. Well, the higher courts differ on that, some say that a man, if he is entitled to have it set aside, should allege he is innocent, and some say to the contrary. But I am taking your statement that you are innocent, and considering that. But I am not going back and re-try the case, because my opinion is it is premature, if a man enters a plea of guilty and it was obtained, the plea was obtained unlawfully, I think it

should be set aside, whether he is guilty or whether he is innocent, and start over again. So I am giving you the benefit of that. A. Very well, Your Honor.

"Q. That is my feeling about the matter."

The Government introduced in evidence the stenographic transcript of the proceedings at which the movant had pleaded guilty, and had been sentenced to imprisonment for one year. The following had occurred as to waiver of counsel:

"Q. Do you have counsel, Mr. Shelton? Do you have a lawyer? A. No, I waive counsel.

"Q. You wish to expressly waive counsel? A. Yes, I do."

The movant had waived reading of the indictment and had moved to strike all references to aliases in the indictment, to which the Government had consented. The following had then occurred as to the entry of the plea of guilty:

"Q. Well, you understand you are pleading guilty to transporting a Lincoln Automobile from Washington, D. C. to Atlanta, Georgia, contrary to Section 2312, Title 18, of the United States Code? A. Yes, sir.

"Q. Now, with that part of the record, we ask the defendant to sign the plea of guilty to count 1."

Thereupon the movant signed the following written plea:

"Plea

"I, Jay Paul Shelton defendant, having received copy of the within Indictment, and having been arraigned and having been advised of my constitutional right to the assistance of counsel, and having been offered counsel by the Court, waive the right to the assistance of counsel and now plead guilty to offense as charged in the 1st Count of the Indictment.

"In Open Court this 20th day of October, 1953.

"Jay Paul Shelton
"Defendant."

The proceedings then concluded as follows:

"Mr. Tysinger: The plea of guilty has been entered, may it please the Court, and for the record, I wish to state that this District has been authorized to take this plea of guilty as to Mr. Shelton by the Attorney General of the United States, received today, and Mr. Gill Martin (sic) being present, I wish to state he can confirm it, that we are going to dismiss the criminal charges in the Southern District of Florida at Miami.

"Mr. Martin: Yes, we can confirm that.

"Mr. Tysinger: Mr. Gill Martin (sic) can confirm that with the Attorney General. That is the information this morning * * * Now, that being completed, I move, if Your Honor sees fit in his discretion to impose sentence on Mr. Shelton at this time, this case having been tried here, a mistrial having been made, I think the Court is amply furnished with sufficient information to understand the matter and can complete the record with justice that meets the situation.

"The Court: Yes.

"Q. Let me ask Mr. Shelton if he wishes to say anything before I impose sentence? A. No, Your Honor, I have nothing particularly to say except, the mercy of the court, any mercy the court sees fit to give me, I would appreciate.

"The Court: All right.

"Mr. Tysinger: May it please the Court, I forgot one thing for the record. Mr. Shelton has filed a series of motions in preparation for trial in the case, and I think Mr. Shelton has something to say about the withdrawal of those motions.

A. Yes, I presume you will take for granted they won't be necessary now.

"The Court: No, this will supersede all that, but let the record show they are withdrawn.

"Mr. Tysinger: Yes, sir.

"The Court: I am imposing sentence of one year in this case to follow your present sentence, Mr. Shelton. I think you are only serving one sentence at this time, is that right? A. Yes, sir, that's right.

"The Court: The sentence will be one year to follow your present sentence which you are now serving. A. Thank you, Your Honor. Might I ask if I could have permission to call some of my relatives to make one call to advise them as to the outcome—not to come for trial, they were coming a long distance from Kentucky.

"The Court: Yes. I see no objection to that. A. I will call them collect.

"Mr. Tysinger: That will be all right. A. Thank you, very much.

"Mr. Shelton: Thank you very much, Your Honor. (Whereupon the hearing was concluded.)"

At the conclusion of the hearing of the motion to vacate the judgment and sentence, the court announced its ruling as follows:

"The Court: * * * I am going to have to decline your motion because I do not feel that under the facts you have shown any imposition of any duress or anything of that kind in connection with your sentence. And I think the record will show, of course a Judge can't testify to himself in a case like this, but I think the record does show there is some testimony that the sentence of a year was cleared by Mr. Tysinger with the Court, and the Court agreed on Mr. Tysinger's recommendation that if you would enter a plea of guilty, or did enter a plea of guilty, that the Court would impose one year. What amount would have been imposed without that recommendation by Mr. Tysinger I do not say. I wouldn't attempt to say. And as to the other objections made there by you, the most Mr. Tysinger perhaps could have said was that he would do the best he could. It seems that he did pretty well, because everything that was mentioned in there was accomplished, and with your experience and your more than average intellect, I would think that when you were talking with Mr. Tysinger that you would realize that he couldn't tell all the judges over the country, and the parole boards what to do. That when he said he would make an effort to get these things, that he would, and apparently he did. He said that he tried to do it. The evidence shows that it was accomplished, and I can't help but think that it was done at least with his cooperation. Court will recess until further order."

Upon the present appeal, the Government has filed a pro forma brief of less than four printed pages, and has favored the Court with no oral argument. The appellant pro se, on the other hand, has filed a very intelligent brief of twenty-two typed pages, and has made a short but sensible oral argument, stating to the Court that he had secured the permission of his probation officer to make the trip from Atlanta to New Orleans and return for such purpose.

Bearing upon the issue of whether this appeal has become moot, the appellant in his brief makes the following statement which the Government does not controvert:

"Although the one-year sentence in question was imposed more than three years ago, it will not expire until April 1958, due to the fact that it runs consecutively to a four-year sentence imposed by the U. S. District Court in New Orleans July 31, 1952, and due to the additional fact that the four-year sentence was inoperative approximately nine

months pending appeal. The prison officials aggregated the two sentences for purposes of computing 'good time' and conditional release date, and appellant was *conditionally* released on the aggregated sentence October 17, 1956; however, as stated above, the maximum expiration date on the aggregated sentence will not be reached until April 1958. Appellant is emphasizing this fact because Judge Hooper, in denying the motion to vacate sentence and application to appeal in forma pauperis, seemed to rely heavily on the erroneous assumption that appellant had only a short time left to serve, and that the case would soon become moot. (R. 117) The fact is, however, as shown above, that the case will not become moot before April 1958, as appellant will be in a form of constructive custody until that time, unless he is successful on this appeal."

As appears from the first four words of Section 2255, its provisions may be availed of only by "a prisoner in custody." Upon oral argument, the movant stated that he was not allowed to leave Atlanta without the consent of his probation officer, to whom he had to make monthly reports. His legal position is the same as if he had been released on parole.[5] Without citation of authority, the appellant assumes that he remains "in constructive custody" until the maximum expiration date of his aggregated sentences in April, 1958. Respectable reasoning and authority might be marshalled to support appellant's assumption. The legal status of a parolee was thus stated in a case otherwise inapt on its facts:

"The parole authorized by the statute does not suspend service or operate to shorten the term. While on parole the convict is bound to remain in the legal custody and under the control of the warden until the expiration of the term, less allowance, if any, for good conduct. While this is an amelioration of punishment, it is in legal effect imprisonment. The sentence and service are subject to the provision * * * that if the parole be terminated the prisoner shall serve the remainder of the sentence originally imposed without deduction for the time he was out on parole." Anderson v. Corall, 263 U.S. 193, 196, 44 S.Ct. 43, 44, 68 L.Ed. 247.

There is some conflict in the authorities as to whether a paroled prisoner is entitled to a writ of habeas corpus in order to secure his absolute discharge from penal supervision.[6] With considerable citation of authority it is stated in 39 C.J.S., Habeas Corpus, § 9, pp. 439, 440:

"An actual restraint is necessary to warrant interference by habeas corpus; but any restraint which precludes freedom of action is sufficient, and actual confinement in jail is unnecessary."

The Supreme Court used some illuminating language in holding that a medical officer in the Navy, awaiting court martial charges was not entitled to habeas corpus even though he had been notified by the Secretary of the Navy, " 'You are hereby placed under arrest, and you will confine yourself to the limits of the city of Washington.' " Wales v. Whitney, 114 U.S. 564, 566, 5 S.Ct. 1050, 1051, 29 L.Ed. 277:

"Something more than moral restraint is necessary to make a case for *habeas corpus*. There must be

5. "A prisoner having served the term or terms for which he shall have been sentenced after June 29, 1932, less good time deductions, shall upon release be treated as if released on parole, and shall be subject to all provisions of law relating to the parole of United States prisoners until the expiration of the maximum term or terms for which he was sentenced." 18 U.S.C.A. § 4164.

6. See Sellers v. Bridges, 153 Fla. 586, 15 So.2d 293, 148 A.L.R. 1240, and attached annotation at 148 A.L.R. 1243, et seq.

actual confinement or the present means of enforcing it. The class of cases in which a sheriff or other officer, with a writ in his hands for the arrest of a person whom he is required to take into custody, to whom the person to be arrested submits without force being applied, comes under this definition. The officer has the authority to arrest and the power to enforce it. If the party named in the writ resists or attempts to resist, the officer can summon by-standers to his assistance, and may himself use personal violence. Here the force is imminent and the party is in presence of it. It is physical power which controls him, though not called into demonstrative action. It is said in argument that such is the power exercised over the appellant under the order of the secretary of the navy. But this is, we think, a mistake. If Dr. Wales had chosen to disobey this order, he had nothing to do but take the next or any subsequent train from the city and leave it. There was no one at hand to hinder him. And though it is said that a file of marines or some proper officer could have been sent to arrest and bring him back, this could only be done by another order of the secretary, and would be another arrest, and a real imprisonment under another and distinct order. Here would be a real restraint of liberty, quite different from the first. The fear of this latter proceeding, which may or may not keep Dr. Wales within the limits of the city, is a moral restraint which concerns his own convenience, and in

regard to which he exercises his own will." Wales v. Whitney, supra, 114 U.S. at pages 571–572, 5 S.Ct. at page 1053.

It is clear that the word "custody," as used in Section 2255, has the same meaning as in habeas corpus.[7] In this connection, however, it may be noted that Section 2255 proceedings are not embarrassed by the inquiry necessary in habeas corpus as to what officer has custody of the prisoner and can produce his body to answer the judgment of the court. See Van Meter v. Sanford, 5 Cir., 99 F.2d 511.

In that case, Judge Sibley, speaking for this Court with his usual force and authority, held explicitly that in a habeas corpus proceeding where, pending appeal, the petitioner was released on parole for the remainder of his maximum sentence, the appeal must be dismissed on the ground that the prisoner was no longer in the warden's custody or control. Similar rulings have since been made in this Circuit,[8] in other circuits,[9] and perhaps (though this is not clear) as a ground for the denial of certiorari by the Supreme Court.[10]

All of the decisions referred to in the preceding paragraph, except the most recent Cummings case cited at the end of Footnote 9, were before the landmark case of United States v. Morgan, 346 U.S. 502, 74 S.Ct. 247, 249, 98 L.Ed. 248, and the Cummings case failed to note the teachings of United States v. Morgan, supra. In that case, the Supreme Court said as to the form of the proceeding:

"The papers are labeled as though they sought a common law writ of error *coram nobis* but the notice of

---

7. Fooshee v. United States, 5 Cir., 203 F. 2d 247, 248; United States v. Bradford, 2 Cir., 194 F.2d 197, 200; Crow v. United States, 9 Cir., 186 F.2d 704, 705; Lopez v. United States, 9 Cir., 186 F.2d 707; Owens v. United States, 5 Cir., 174 F.2d 469, 470, concurring opinion of Judge Sibley.

8. Biron v. Collins, 5 Cir., 145 F.2d 758;

Siercovich v. McDonald, 5 Cir., 193 F.2d 118.

9. Weber v. Hunter, 10 Cir., 137 F.2d 926; Factor v. Fox, 6 Cir., 175 F.2d 626; Hawley v. United States, 10 Cir., 194 F. 2d 52; United States ex rel. St. John v. Cummings, 2 Cir., 233 F.2d 187.

10. Weber v. Squier, 315 U.S. 810, 62 S. Ct. 800, 86 L.Ed. 1209.

the motion indicates that an order voiding the judgment is sought. In behalf of the unfortunates, federal courts should act in doing justice if the record makes plain a right to relief.[3] We think a belated effort to set aside the conviction and sentence in the federal criminal case is shown. We therefore treat the record as adequately presenting a motion in the nature of a writ of error *coram nobis* enabling the trial court to properly exercise its jurisdiction. Adams v. U. S. ex rel. McCann, 317 U.S. 269, 272, 63 S.Ct. 236, 87 L.Ed. 268.

"3. Darr v. Burford, 339 U.S. 200, 203–204, 70 S.Ct. 587, 589, 590, 94 L.Ed. 761:

" 'The writ of habeas corpus commands general recognition as the essential remedy to safeguard a citizen against imprisonment by State or Nation in violation of his constitutional rights. To make this protection effective for unlettered prisoners without friends or funds, federal courts have long disregarded legalistic requirements in examining applications for the writ and judged the papers by the simple statutory test of whether facts are alleged that entitle the applicant to relief.' "

The Court held that where the prejudicial results of the conviction persisted, even though the entire term had been served, a motion in the nature of the extraordinary writ of coram nobis must be heard by the federal trial court to determine whether the conviction was valid. It is interesting to note that the Supreme Court listed among the examples of the common-law scope of that writ: "a conviction on a guilty plea through the coercion of fear of mob violence, failure to advise of right to counsel." 346 U.S. at page 508, 74 S.Ct. at page 251.

In United States ex rel. Bogish v. Tees, 3 Cir., 211 F.2d 69, the parole of a state prisoner had been revoked by the state because of his conviction in federal court for a crime allegedly committed while on parole. He brought habeas corpus in an effort to test the validity of his federal conviction. Judge Maris, speaking for the Third Circuit, said:

"The dilemma with which the relator is faced is thus apparent. He must establish the invalidity of his federal conviction before he can ask the Pennsylvania Board of Parole to revoke its action in recommitting him because of that conviction. And he cannot establish the invalidity of that conviction in a habeas corpus suit directed against his state custodian. Nor can he do so in a statutory proceeding under section 2255 of title 28, United States Code. For the remedy given by that section is available only to a prisoner who is actually in custody under the sentence which he seeks to set aside. Here the relator has served in full the sentence imposed by the district court and is now, as we have seen, a prisoner in the custody of a state penitentiary warden under the sentence of a state court.

"There is, however, a procedure by which one in the position of the relator can obtain a determination of the constitutional validity of a criminal judgment against him which has been fully executed but the effects of which persist to his detriment. This may be accomplished by a motion in the nature of a writ of error coram nobis. United States v. Morgan, 1954, 346 U.S. 502, 74 S.Ct. 247 [98 L.Ed. 248]. In the Morgan case the Supreme Court suggested that in behalf of unfortunate prisoners without friends or funds a court should act in doing justice, if the record makes plain a right to relief, without regard to legalistic requirements of pleading, citing Darr v. Burford, 1950, 339 U.S. 200, 203–204, 70 S.Ct. 587, 94 L.Ed. 761.

"We conclude that the interests of justice require us to approach the present case in this way. While it is true that the United States is not technically the respondent in this case as it should be on a motion in the nature of a writ of coram nobis it has nonetheless appeared in the person of the United States Attorney who has filed a brief in support of the validity of the judgment of the district court which is under attack by the relator. We therefore, think it proper to consider the relator's petition, which as we have seen is not sufficient for the issuance of a writ of habeas corpus, as though it were a motion in the nature of a writ of error coram nobis seeking to set aside the relator's conviction in the district court." United States v. Tees, supra, 211 F.2d at pages 71–72.

See also, Haywood v. United States, D.C.S.D.N.Y., 127 F.Supp. 485.

■ Under the authority of the Morgan, Tees, and Haywood cases, last cited, we think that the ends of justice require us to disregard technicalities, to treat the present motion as in the nature of the extraordinary writ of coram nobis, and thereby to accord the movant an opportunity to attempt to show that his conviction was invalid.

The record does not show that the district court complied with the requirements of the Von Moltke case, Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309, in making certain that the accused's waiver of counsel was intelligently made. We would, however,

be loath to reverse upon that ground alone in view of the movant's unusual intelligence and obvious experience.

■ The present motion would be obviously without foundation, and probably would not have been made, if the district court had complied with the mandate of Rule 11, F.R.Crim.Proc., not to accept the plea of guilty "without first determining that the plea is made voluntarily with understanding of the nature of the charge." We doubt, however, whether that requirement[11] is so fundamental as to be availed of on a writ of coram nobis if the accused's voluntariness and understanding in fact be proved. The failure to comply with it, however, does cast the burden on the Government to show that the plea of guilty was voluntarily and understandingly made. That it was understandingly made in this case is not controverted, but the question is, was the guilty plea made voluntarily?

■ In pleading guilty, a defendant confesses in open court his guilt of the the offense charged.[12] In Ziang Sung Wan v. United States, 266 U.S. 1, 14, 45 S.Ct. 1, 3, 69 L.Ed. 131, Mr. Justice Brandeis speaking for the Court said:

"In the federal courts, the requisite of voluntariness is not satisfied by establishing merely that the confession was not induced by a promise or a threat. A confession is voluntary in law if, and only if, it was, in fact, voluntarily made."

See also, "Voluntary Confession," 44 Words & Phrases, p. 390, and pocket supplement.

---

11. Simply a restatement of the pre-existing law. See Uveges v. Pennsylvania, 335 U.S. 437, 442, 69 S.Ct. 184, 93 L.Ed. 127; Fogus v. United States, 4 Cir., 34 F.2d 97; United States v. Davis, 7 Cir., 212 F.2d 264, 267; United States v. Swaggerty, 7 Cir., 218 F.2d 875, 879; 14 Am.Jur., Criminal Law, Sec. 271.

12. Hornbrook v. United States, 5 Cir., 216 F.2d 112, 113; Littlejohn v. Hiatt, 5 Cir., 197 F.2d 334, 335; Accardi v. United States, 8 Cir., 15 F.2d 619, 621; United

States v. Otto, 2 Cir., 54 F.2d 277, 280; Weir v. United States, 7 Cir., 92 F.2d 634, 635, 114 A.L.R. 481; Forthoffer v. Swope, 9 Cir., 103 F.2d 707, 708; Steffler v. United States, 7 Cir., 143 F.2d 772, 774; Donnelly v. United States, 10 Cir., 185 F.2d 559, 560; Friedman v. United States, 8 Cir., 200 F.2d 690, 696; Lipscomb v. United States, 8 Cir., 209 F.2d 831, 834; Joyner v. Parkinson, 7 Cir., 227 F.2d 505, 508; 22 C.J.S., Criminal Law, § 424.

█ If a plea of guilty is made upon any understanding or agreement as to the punishment to be recommended, it is essential, we think, that, before accepting such plea, the district court should make certain that the plea is in fact made voluntarily. Otherwise, the plea is subject to impeachment as having been induced by a promise of recommended leniency.[13]

█ There is no doubt, indeed it is practically conceded, that the appellant pleaded guilty in reliance on the promise of the Assistant United States Attorney that he would receive a sentence of only one year. The court, before accepting the plea, did not ascertain that it was in truth and in fact a voluntary plea not induced by such promise. It necessarily follows that the judgment of conviction must be set aside and the plea of guilty vacated.

It is not necessary to consider the other promises, nor the question of their fulfillment vel non, litigated below. Justice and liberty are not the subjects of bargaining and barter.

█ Finally, we agree with the district court that the question of actual guilt or innocence need not be determined on this motion,[14] but that the issue is whether the plea of guilty was voluntarily entered. Upon the present record, we are left in no doubt upon that issue. The judgment is, therefore, reversed and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

TUTTLE, Circuit Judge (dissenting).

Though I agree in principle with the several preliminary matters dealt with in the opinion as to the propriety of this proceeding and appeal, as against the suggestion of mootness, etc. made by the Government, I must disagree with the principal thesis proclaimed by my colleagues: that a plea of guilty is subject to impeachment merely because it had been induced by a promise of recommended leniency.

Because of the very considerable implications that this decision will have on the administration of justice I feel I must, though with deference, dissent from the opinion of the Court.

A search of all the cases cited by the majority (and of several additional ones referred to therein or found in the annotations) fails to disclose a single one in which a plea of guilty (or of nolo contendere) was permitted to be withdrawn as involuntarily made in circumstances such as are disclosed by the record here and cited in the opinion, i.e. where made with full knowledge of the consequences, without threats of improper pressures, upon promises which have apparently been kept in good faith (in spite of petitioner's unsubstantiated allegations to the contrary), and which were not inherently improper. Though in many of the cited cases the language of the holding or the dictum is broad enough to condemn all pleas induced by any "promise," a careful analysis will show that really they fall into two not mutually exclusive categories, neither of which covers the present situation.

---

13. Kercheval v. United States, 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009; Motley v. United States, 5 Cir., 230 F.2d 110; United States v. Parrino, 2 Cir., 212 F.2d 919, 921; Futterman v. United States, 91 U.S.App.D.C. 331, 202 F.2d 185; United States v. Shneer, 3 Cir., 194 F.2d 598, 600; United States v. Paglia, 2 Cir., 190 F.2d 445, 447; United States v. Lias, 4 Cir., 173 F.2d 685, 688; Behrens v. Hironimus, 4 Cir., 166 F.2d 245, 247; Bryarly v. Howard, 7 Cir., 165 F.2d 576, 577; United States v. Sehon Chinn, D.C.S.D.W.Va., 74 F.Supp. 189, 191, affirmed, 4 Cir., 163 F.2d 876.

14. Kercheval v. United States, 274 U.S. 220, 224, 47 S.Ct. 582, 71 L.Ed. 1009; Hornbrook v. United States, 5 Cir., 216 F.2d 112, 113; Friedman v. United States, 8 Cir., 200 F.2d 690, 696; Richardson v. United States, 8 Cir., 217 F.2d 696, 699; Haywood v. United States, D.C. S.D.N.Y., 127 F.Supp. 485, 488; cf. possibly contra, United States v. Nostrand Corporation, 2 Cir., 168 F.2d 481, 482.

The first group includes the cases in which the plea was induced by improper physical and mental pressures or by the threats of the same, and the "promise" merely related to the discontinuance of the illegal conduct. These cases include Ziang Sung Wan v. United States, 266 U.S. 1, 45 S.Ct. 1, 69 L.Ed. 131, the Supreme Court case quoted from by the majority (involving a forced confession rather than a plea of guilty), as well as several of the cases cited in footnote 13.[1] The vice that makes it necessary to permit the impeachment of a plea so induced is not in the "promise" but is in the illegal conduct to which it relates.

The second group includes all the cases in which for one reason or another the defendant was not fully aware of all the consequences of his plea;[2] pertinent here are those cases in which the defendant was misled on purpose,[3] or innocently[4] by promises of leniency by the court,[5] the prosecutor or the police,[6] and/or his own counsel[7] (though perhaps not if deception was entirely self-induced[8]), which promises were either not performable at all[9] or were, contrary to the defendant's understanding, not within the power of the promissor,[10] or were simply disregarded once their purpose was accomplished.[11] Here again

1. Bryarly v. Howard, 7 Cir., 165 F.2d 576 (dicta); Behrens v. Hironimus, 4 Cir., 166 F.2d 245 (incessant questioning, intravenous feeding); United States v. Paglia, 2 Cir., 190 F.2d 445, 448 (promise to withdraw a charge as to which the Government did not have sufficient evidence).

2. United States v. Sehon Chinn, D.C.S.D. W.Va., 74 F.Supp. 189, affirmed 163 F.2d 876 (misrepresentation by counsel insufficient to vitiate plea; dictum: misrepresentation by prosecution would be); Bryarly v. Howard, supra (plea induced by promise to withhold prosecution on it entirely on pretense that it would merely help police clear its records); Behrens v. Hironimus, supra (in addition to "third-degree" methods, supra, apparently unkept or misrepresented promises of a lenient sentence); United States v. Lias, 4 Cir., 173 F.2d 685 (inadvertent misleading effect of judge's remarks to counsel relating to proposed sentence); United States v. Shneer, 3 Cir., 194 F.2d 598 (dictum: plea might be withdrawn if expectation of leniency induced by misrepresentation of prosecutor to counsel or of counsel to defendant); Futterman v. United States, 91 U.S.App.D.C. 331, 202 F.2d 185 (dictum: while misrepresentation leading to mistaken hope of leniency not enough, perhaps promise by counsel of probation would be); United States v. Parrino, 2 Cir., 212 F.2d 919 (dictum: though counsel's innocent misrepresentation as to a collateral effect of a plea would not vitiate it, perhaps if such were made innocently by the court or the prosecutor, or improperly by counsel, or related to the direct consequences of the plea it would not be permitted to stand); Motley v. United States, 5 Cir., 230 F.2d 110 (allegation that counsel after conference with prosecutor informed defendant that if he pleaded guilty he would receive a lesser term than by insisting on grand jury, and maximum term was actually imposed, is sufficient to require a hearing on whether plea was improperly induced).

3. Bryarly v. Howard, supra.

4. United States v. Lias, supra; United States v. Shneer, supra; United States v. Parrino, supra.

5. United States v. Lias, supra; United States v. Parrino, supra (dicta).

6. United States v. Sehon Chinn, supra (dicta); Bryarly v. Howard, supra; United States v. Parrino, supra (dicta).

7. United States v. Shneer, supra (dicta); Futterman v. United States, supra; Motley v. United States, supra; but cf. United States v. Sehon Chinn, supra; United States v. Parrino, supra.

8. United States v. Shneer, supra.

9. Cf. United States v. Parrino, supra.

10. United States v. Sehon Chinn, supra; cf. United States v. Fox, 3 Cir., 130 F.2d 56, certiorari denied 317 U.S. 666, 63 S.Ct. 74, 87 L.Ed. 535.

11. Bryarly v. Howard, supra; United States v. Paglia, supra (dicta). In many instances it is impossible to tell from the opinion whether a sentence heavier than that expected was imposed because the court disregarded the prosecutor's advice or because the prosecutor did not abide by his commitment.

the vice that vitiates the plea is not the "promise" but the misapprehension to which it gave rise. No case has been cited in which a plea of guilty was permitted to be withdrawn because induced by a promise by a prosecutor to recommend leniency where such promise was kept, nor where the accused understood that final determination of the sentence would be for the judge and a heavier sentence was actually imposed than that contained in the promised recommendation. A fortiori there is no case in which, as is the situation here, a plea has been voided where the actual sentence did not exceed that which was promised.

A correct statement of the applicable rule might be: a plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes). As has been stated in an oft cited case, United States v. Colonna, 3 Cir., 142 F.2d 210, at page 211:

> "The cases uniformly hold that motions to withdraw a plea of guilty should be denied where the plea of guilty was entered either by the defendant or his counsel in his presence, and if the defendant knew and understood what was being done and there was not present any circumstances of *force, mistake, misapprehension, fear, inadvertence* or *ignorance* of his rights and understanding of the consequences of the plea." (Emphasis added.)

Thus the plea must stand if it has not been tainted by any intentional or unintentional overreaching of the defendant.

It need not be feared that this restriction on the impeachability of pleas of guilty to the circumstances permitted by the former cases will permit the perpetuation of injustice, for although no man should be allowed to bargain away his life or liberty it is not apparent why any innocent person would plead guilty if not subjected to or threatened with illegal pressures (including exhaustive inquisitions or threats to "frame" evidence or a more serious charge[12]), misled by promises not to be fulfilled, or induced by promises inherently improper, merely because he receives assurances that such a plea may lead to punishment less severe than that which he would receive if unjustly (but fairly) convicted. Our own faith in the just operation of our judicial system and the necessity that accused persons should have at least minimal trust in it should prevent us from yielding to arguments based on such unfounded anxiety.

It is to be feared that the extension of the holding of the most liberal of the above cases to include situations such as that here presented would considerably impede the administration of justice without any corresponding benefit to accused persons. It is generally known that the great bulk of criminal cases are disposed of by pleas of guilty made after some discussion between the defendant and/or his counsel and the prosecuting attorney in which the latter frequently makes some commitment as to the sentence he will recommend or as to other charges or prosecutions he will drop; if this were not so, or if this Court holds that it may not be so, there would be few inducements for any person to plead guilty. Furthermore this decision would make it possible to impeach many now invulnerable sentences, and though in such a proceeding the burden of asserting innocence is at least preliminarily on the petitioner [13] after many years he

---

12. Cf. United States v. Paglia, supra, discussion 190 F.2d at page 448.

13. Rule 32(d), Fed.Rules Cr.Proc., 18 U.S. C.A., permits the withdrawal of a plea

may be in a much better position to sustain it than the Government to oppose it.[14]

In the present case it appears from the record and from his own appearance before us that the petitioner was an intelligent man, fully able to comprehend the alternatives open to him and the value of the prosecutor's promises. It also appears that the prosecutor in good faith tried to live up to his commitments and to a very large extent was successful in his efforts; in particular, the sentence imposed on the plea in question was that which he had promised to recommend. Nor can it be said that any of the promises were inherently improper for the offer to help obtain the dismissal of federal prosecutions in other districts does not differ fundamentally from the usual practice whereby a prosecutor agrees to nolle prosequi all except the charges on which a plea is to be entered. Also, the trial court apparently believed that the request for special consideration originated with the petitioner and that the action of the prosecutor was of great advantage to him. Finally there is no evidence that any improper threats were made, for the dismal prospect of prosecution in Miami, etc., was conjured up by the petitioner himself and was not in any case a mere weapon improperly fashioned by the prosecution to induce compliance with its proffered bargain.

The plea of guilty having been entered voluntarily within the meaning of Rule 11, Fed.Rules Cr.Proc., 18 U.S.C.A., and not resulting in a manifest injustice within the meaning of Rule 32(d), Fed.Rules Cr.Proc., 18 U.S.C.A., the dismissal of this proceeding by the lower court should be affirmed.

of guilty after sentence only "to correct manifest injustice," and it is hard to see how a conviction could be thus described unless the accused were really innocent or perhaps if the plea or conviction were tainted by a denial of due process. That the standards of Rule 32(d) are also applicable in § 2255 proceedings, see

United States v. McNair, D.C.D.C., 18 F.R.D. 417, 419, affirmed, D.C.Cir., 235 F.2d 856.

14. United States v. Shillitani, D.C.S.D. N.Y., 16 F.R.D. 336, 339 fn. 6; United States v. Espinosa, D.C.S.D.N.Y., 16 F. R.D. 420; United States v. McNair, supra.