Vincent E. SCOTT, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 20954.

United States Court of Appeals
District of Columbia Circuit.

Argued Sept. 9, 1968.

Decided Feb. 13, 1969.

Mr. James L. McHugh, Jr., Washington, D. C., with whom Mr. John L. Ingoldsby, Jr., Washington, D. C., (both appointed by this court) and Mr. John G. Kester, Washington, D. C., were on the brief, for appellant.

Mr. James E. Kelley, Jr., Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and William H. Collins, Jr., Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and WRIGHT and LEVENTHAL, Circuit Judges.

BAZELON, Chief Judge:

██ Vincent Scott was convicted of robbery under 22 D.C. Code § 2901 (1967) and sentenced to prison for five to fifteen years. The proceedings preceding his conviction were, we conclude, free from error.[1] The events surround-

---

1. The appellant claims that the continuation of his trial after his co-defendant changed his plea to guilty at the completion of the Government's case denied him due process of law. In the course of questioning the co-defendant to determine the voluntariness of his changed plea, the trial judge elicited a statement that implicated the appellant. At that time Scott's attorney moved for a mistrial on the ground that the trial judge, having heard the statement, would be prejudiced against the appellant. The motion was denied. On appeal Scott raises a somewhat different claim: that the jury must have realized that the co-defendant had changed his plea, and must have been improperly influenced by this realization in passing upon the appellant's guilt or innocence.

We can agree with neither step in this reasoning. There is no necessary reason why the jurors should have concluded that because the co-defendant was absent on the second day, he must have changed his plea to guilty. The jury was, in the first place, instructed that they "must not conjecture, speculate, guess or sur-

mise why the other defendant is not before you at this time." Even if we assume that the jurors might have so speculated despite this admonition, there were other possible explanations for his disappearance: he might have jumped bond; he might have been granted a mistrial; the cases might have been severed.

If the jury did somehow conclude that the co-defendant had changed his plea, moreover, there is no reason why the appellant should have been prejudiced thereby. The theory of his defense was not that there had been no robbery, nor that he and his co-defendant were not present at the scene. His claim rather was that his co-defendant suggested and executed the crime, while he declined the invitation to participate and resolutely looked the other way. Since the co-defendant was by the appellant's own argument guilty, the jury could hardly have been influenced if they did in fact conclude that the former had changed his plea after the first day of trial. In a similar factual situation, a District Court has recently found no constitutional in-

ing his sentencing, however, present thorny questions concerning what factors the trial judge may properly consider at that stage. We affirm the conviction, but remand for a resentencing in accordance with the principles announced in this opinion.

## I

■■■ In reviewing the appellant's claims concerning the events at his sentencing hearing, we do not find it necessary to combat the massed precedent forbidding appellate modification of sentences.[2] The objections raised center not upon the "duration or severity of this sentence,"[3] but upon the reasons for which it was imposed. The trial judge has wide freedom in the information that may be considered in imposing

a sentence.[4] The result, the specific sentence selected, may be beyond the ken of the appellate court. But the appellate court must scrutinize the sentencing process to insure that the trial judge has considered the information available with some regard for its reliability,[5] and has evaluated the information in light of the factors relevant to sentencing. This Court has remanded cases for resentencing where the trial judge failed to avail himself of the proper aids for sentencing, such as mental examinations or presentence reports.[6] We have also refused to accept a trial judge's determination of sentence where the record demonstrated that an improper factor had been considered, such as a statutory sentencing provision since repealed.[7]

In many cases, of course, the appellate court does not know whether the sen-

firmity in a case where, unlike the appellant's, the change of plea by a co-defendant occurred before the jury. See United States ex rel. Huntt v. Russell, 285 F. Supp. 765 (E.D.Pa., May 23, 1968).

2. For more than 70 years federal appellate courts have declared themselves impotent to modify sentences imposed within statutory limits. See, e.g., Gore v. United States, 357 U.S. 386, 393, 78 S. Ct. 1280, 2 L.Ed.2d 1405 (1958), Blockburger v. United States, 284 U.S. 299, 305, 52 S.Ct. 180, 76 L.Ed. 306 (1932), Leach v. United States, 118 U.S.App. D.C. 197, 203, 334 F.2d 945, 951 (1964). The Supreme Court has encountered the rule but seldom, and on those rare occasions has accepted it with only the most summary comment. For the most part, the rule has been announced and applied by the lower appellate courts. Occasional judges have expressed bewilderment concerning the origin of the rule, and have noted the strange contrast it presents to the role of appellate courts in reviewing abuses of discretion in other areas. See, e.g., United States v. Martell, 335 F.2d 764, 766–768 (4th Cir. 1966) (per Sobeloff, C. J.); United States v. Rosenberg, 195 F.2d 583, 604–605 (2d Cir. 1952) (per Frank, C. J.). It has been suggested, in those opinions and elsewhere, that the power given appellate courts to "affirm, modify, vacate, set aside or reverse any judgment" by 28 U.S.C. § 2106 (1964) would on its face extend to modification of sentences. And

in unusual circumstances this Court has invoked that power to impose a sentence of life imprisonment in lieu of capital punishment. See Coleman v. United States, 123 U.S.App.D.C. 103, 357 F.2d 563 (1965) (en banc); Frady v. United States, 121 U.S.App.D.C. 78, 348 F.2d 84, cert. denied, 382 U.S. 909, 86 S.Ct. 247, 15 L.Ed.2d 160 (1965). But in those cases the scope of the power assumed was carefully limited to the factors there present.

3. Townsend v. Burke, 334 U.S. 736, 741, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948).

4. See Williams v. People of State of New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L. Ed. 1337 (1949); cf. Sprecht v. Patterson, 386 U.S. 605, 606–608, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967).

5. See Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948).

6. See Leach v. United States, 118 U.S. App.D.C. 197, 334 F.2d 945 (1964); Jones v. United States, 117 U.S.App.D. C. 169, 327 F.2d 867 (1963) (en banc); Peters v. United States, 113 U.S.App.D. C. 236, 307 F.2d 193.

7. See Coleman v. United States, 123 U.S. App.D.C. 103, 357 F.2d 563 (1965) (en banc); cf. Verdugo v. United States, 402 F.2d 599 (9th Cir., May 16, 1968).

tencing judge has performed his task thoroughly or well. The frequent blankness of the record has led to suggestions that the trial judge should be required to set forth his reasoning in announcing the sentence decided upon.[8] But that problem is not before us. Here the trial judge explained in some detail the reasons for which the sentence was imposed. He stated repeatedly throughout the hearing that he did not believe the exculpatory testimony the appellant had given at trial. And at one point the judge indicated that he was influenced as well by the fact that the appellant had insisted upon a trial in the first place:

> Now the Court didn't believe your story on the stand, the Court believes you deliberately lied in this case. If you had pleaded guilty to this offense, I might have been more lenient with you.

A few moments later, the sentencing hearing flew off on a revealing tangent when the trial judge read a letter submitted by the appellant. The letter, from his attorney, referred to a visit the lawyer had made to the judge's law clerk. In it he reported that in the clerk's opinion "there was only one way to get a light sentence from Judge _____ and that was to confess that you did the robbery, to apologize four or five times and to say that you were willing to turn over a new leaf." The trial judge then called his clerk to the witness stand and interrogated him concerning his conversation with the attorney. The clerk affirmed that the letter fairly reflected the substance of his comments to the lawyer. He stated, "It has always been my opinion that you view sentencing differently when someone admits guilt rather than maintaining innocence." He added, however, "This has nothing to do with private conversations we have had in chambers. It is from things I have heard

while sitting in that seat during sentencing hearings."

The judge himself then commented upon his reactions to defendants found guilty by the jury who continued to assert their innocence at allocution. He went on, "I hope sometime I hear some defendant say, 'Judge, I am sorry, I am sorry for what I did.' That is what I have in mind."

## II

The appellant argues that he was denied due process of law by the trial judge's consideration of the "inflammatory" letter and by the pressure placed upon him to confess his guilt after trial. The federal courts have examined this issue but seldom, perhaps because trial judges rarely announce a reliance upon this consideration. The Tenth Circuit has upheld a sentence of 18 months that the trial judge imposed instead of probation because the appellant continued to assert his innocence after trial.[9] It did so, however, not because the court approved of the practice, but because "the matter is one entirely for the trial court." [10] To the extent that the court concluded that it lacked as an appellate court not only the power to modify a sentence but also the authority to review the sentencing process, we disagree.

The Fifth Circuit has recently reached precisely the opposite conclusion. The appellant in Thomas v. United States [11] rejected the trial court's invitation to "come clean and make a clean breast of this thing for once and for all" at his sentencing hearing. The trial judge then imposed the maximum sentence permitted by statute. Judge Rives reasoned for the court,

> It must be remembered that, at the time of his allocution, Thomas had not been finally and irrevocably adjudged guilty. Still open to him were the

8. *See, e.g.,* Symposium, Appellate Review of Sentencing, 32 F.R.D. 257, 263, 274–275 (1962).

9. Williams v. United States, 273 F.2d 469 (10th Cir. 1959).

10. *Id.* at 470.

11. 368 F.2d 941 (5th Cir. 1966).

processes of motion for new trial * * *, appeal, petition for certiorari, and collateral attack. * * * If he chose [to confess guilt] * * *, he would elect to forego all of the abovenoted post-conviction remedies [and] to confess to the crime of perjury * * *. Moreover, he would abandon the right guaranteed by the Fifth Amendment to choose not to be a witness against himself, not only as to the crime of which he had been convicted, but also as to the crime of perjury.[12]

The opinion concluded,

When [the appellant] received harsher punishment than the court would have decreed had he waived his Fifth Amendment rights, he paid a judicially imposed penalty for exercising his constitutionally guaranteed rights.[13]

This analysis equates a confession of guilt at allocution with a waiver of the self-incrimination privilege, and thereby imports the same strict standard of voluntariness that Judge Rives would also require for a plea of guilty.[14] In struggling with the problems associated with plea bargaining, the Fifth Circuit sitting en banc has settled upon a less stringent standard of voluntariness which rejects such reliance upon the self-incrimination privilege.[15] But whatever the reasons why a guilty plea may differ from a confession for self-incrimination purposes, the Fifth Amendment standards demanded by the *Thomas* case seem clearly required when a confession at allocution is involved, at least when the defendant has testified at trial and denied the crime. For, as Judge

Rives points out, not only would a confession of guilt at the sentencing hearing be, in literal terms, just that—a confession—but also such a statement would constitute an admission of perjury.

It might be argued that the dilemma between waiving Fifth Amendment rights and receiving a harsher sentence might be elminated by a rule making a defendant's statement at his allocution inadmissible in other proceedings.[16] But the appellant had no such assurance in this case.[17] The trial judge was eager for an acknowledgment of guilt presumably because a confession might indicate repentance. But the appellant could reasonably have believed that he could show penitence—real or affected—only at the price of prejudicing his appeal, if not worse. Whether the trial judge intended or not "to bargain thus with the defendant," we conclude that "the court was without right * * * to put a price on an appeal."[18]

### III

■ Since a resentencing will be necessary, two other considerations the trial judge relied upon in sentencing the appellant require comment. The first problem arises from the judge's repeated statements that he believed the appellant had committed perjury on the witness stand in denying that he had participated in the robbery. There are two arguments why this belief would properly influence the choice of a sentence: (1) that additional punishment should be imposed for the independent substantive offense of perjury; (2) that the commission of perjury reflected adversely upon the appellant's prospects for re-

12. *Id.* at 945.

13. *Id.* at 946.

14. *See* Shelton v. United States, 242 F. 2d 101 (5th Cir.), rev'd on rehearing, 246 F.2d 571 (1957) (en banc), rev'd 356 U.S. 26, 78 S.Ct. 563, 2 L.Ed.2d 579 (1958) (per curiam), discussed *infra.*

15. *See* Shelton v. United States, 246 F. 2d 571 (5th Cir. 1957) (en banc), rev'd

356 U.S. 26, 78 S.Ct. 563, 2 L.Ed.2d 579 (1958) (per curiam), discussed *infra.*

16. *Cf.* Simmons v. United States, 390 U. S. 377, 389–394, 88 S.Ct. 967, 19 L.Ed. 2d 1247 (1968).

17. *Cf.* Gardner v. Broderick, 392 U.S. 273, 279, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968).

18. Worcester v. C. I. R., 370 F.2d 713, 718 (1st Cir. 1966) (per Aldrich, C. J.).

habilitation, and therefore justified a lengthier sentence for the crime of robbery.[19]

The first argument deserves emphatic rejection. The Government could if it wished prosecute the appellant for perjury.[20] In such a proceeding, the appellant would have all the protections of a criminal trial. If the trial judge in fact imposed additional punishment upon the appellant for the supposed commission of perjury, he plainly denied the appellant the trial upon that offense to which Scott was entitled.

As for the second argument, the peculiar pressures placed upon a defendant threatened with jail and the stigma of conviction make his willingness to deny the crime an unpromising test of his prospects for rehabilitation if guilty. It is indeed unlikely that many men who commit serious offenses would balk on principle from lying in their own defense. The guilty man may quite sincerely repent his crime but yet, driven by the urge to remain free, may protest his innocence in a court of law. This realization, indeed, unquestionably accounts for the extreme infrequency with which convicted criminals are in fact prosecuted for perjury committed at their trials.

The Government argues that the appellant "has no constitutional right to lie." The beguiling simplicity of this proposition misphrases the question. Of course a defendant has no constitutional right to lie, however much we may sympathize with his too human temptation. But the defendant does have a right to testify in his own defense. In doing so, he risks the jury's disbelief. If he in fact fails to convince the jurors, conviction and punishment will follow. If the Government for whatever reason concludes that prosecution for perjury is appropriate, he risks punishment for that as well. To allow the trial judge to impose still further punishment because he too disbelieves the defendant would needlessly discourage the accused from testifying in his own behalf.

IV

The trial judge also stated at the sentencing hearing, "If you had pleaded guilty to this offense, I might have been more lenient with you." The stark import of this comment is that the defendant paid a price for demanding a trial. In view of the prohibitions the Supreme Court has laid down against making the exercise of Fourth,[21] Fifth,[22] and Sixth[23] Amendment rights costly, the pricetag thus placed on the right to a fair trial which these amendments guarantee would, on first impression, seem clearly impermissible.

And yet, despite the startling incongruity, empirical evidence supports the proposition that judges do sentence defendants who have demanded a trial more severely.[24] At least one Court of Appeals has taken approving "judicial notice of the fact that trial courts quite generally impose a lighter sentence on pleas of guilty than in cases where the accused pleaded not guilty but has been found guilty by a jury."[25] An advisory com-

19. *See* Note, The Influence of the Defendant's Plea on Judicial Determination of Sentence, 66 YALE L.J. 204, 211–217 (1956).

20. United States v. Williams, 341 U.S. 58, 62, 71 S.Ct. 595, 95 L.Ed. 747 (1951).

21. *See* Simmons v. United States, 390 U.S. 377, 389–394, 88 S.Ct. 967, 19 L.Ed. 2d 1247 (1968).

22. *See, e.g.,* Gardner v. Broderick, 392 U.S. 273, 276, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968); Spevack v. Klein, 385 U.S.

511, 515, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967).

23. *See* United States v. Jackson, 390 U.S. 570, 581–585, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968).

24. *See, e.g.,* Note, The Influence of the Defendant's Plea or Judicial Determination of Sentence, 66 YALE L.J. 204, 206–209 (1956).

25. Dewey v. United States, 268 F.2d 124, 128 (8th Cir. 1959).

mittee of the American Bar Association has concluded that "it is proper for the court to grant charge and sentence concessions to defendants who enter a plea of guilty * * * when the interest of the public in the effective adminstration of criminal justice would thereby be served."[26]

Much of this adulation for differential sentencing has been rationalized without frank recognition of the fact that whatever its advantages, the practice does exact a price from those who insist upon a trial. But the arguments in favor of differential sentencing cannot be dismissed by a wooden insistence that the exercise of constitutional rights can never be made costly. Some rights may be so vital that no deterrence to their free exercise can be tolerated. The Supreme Court has accorded such preeminent status to the self-incrimination privilege.[27] But in other areas the Court has suggested the need for a less truncated analysis. In United States v. Jackson,[28] the Court held that Congress could not provide for a death penalty "applicable only to those defendants who assert the right to contest their guilt before a jury."[29] But in doing so the majority did not rely upon the summary argument that the exercise of such a right could in no way be made costly. The Court rather asked "whether that effect is unnecessary and therefore excessive."[30]

In such cases as Sherbert v. Verner[31] the Court has also suggested that some constitutional interests are not inviolate. After concluding there that a disqualification for unemployment benefits burdened the exercise of her religion by a Seventh Day Adventist who refused to work on Saturdays, the Court phrased the relevant test as "whether some compelling state interest * * * justifies the substantial infringement of appellant's First Amendment right."[32]

The Supreme Court has offered little guidance concerning which constitutional rights can tolerate some chilling effect and which cannot. Perhaps the right to a trial, like the self-incrimination privilege but apparently unlike the right to a jury, belongs in the latter camp. But until the Supreme Court speaks, the practice of differential sentencing should be evaluated with some attention paid to the nature of the price exacted from those who plead innocent and why it is exacted.

Two arguments inevitably appear whenever differential sentencing is discussed. The first is that the defendant's choice of plea shows whether he recognizes and repents his crime. One difficulty with this argument is that no court or commentator has explained why a defendant's insistence upon his self-incrimination privilege is not also evidence of a lack of repentance. Or his insistance that evidence unconstitutionally seized should not be admitted.

Repentance has a role in penology. But the premise of our criminal jurisprudence has always been that the time for repentance comes after trial. The adversary process is a fact-finding engine, not a drama of contrition in which a prejudged defendant is expected to knit up his lacerated bonds to society.

There is a tension between the right of the accused to assert his innocence and the interest of society in his repentance. But we could consider resolving this conflict in favor of the latter interest only if the trial offered an unparalleled opportunity to test the repentance of the ac-

26. AMERICAN BAR ASSOCIATION PROJECT ON MINIMUM STANDARDS FOR CRIMINAL JUSTICE, STANDARDS RELATING TO PLEAS OF GUILTY § 1.8(a) (1967) [hereinafter PLEAS OF GUILTY].

27. See, e.g., Gardner v. Broderick, 392 U.S. 273, 276, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968); Spevack v. Klein, 385 U.S. 511, 515, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967).

28. 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed. 138 (1968).

29. Id. at 581, 88 S.Ct. at 1216.

30. Id. at 582, 88 S.Ct. at 1216.

31. 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed. 2d 965 (1963).

32. Id. at 406, 83 S.Ct. at 1795.

cused. It does not. There is other, and better, evidence of such repentance. The sort of information collected in presentence reports provides a far more finely brushed portrait of the man than do a few hours or days at trial. And the offender while on probation or in prison after trial can demonstrate his insight into his problems far better than at trial.

If the defendant were unaware that a proper display of remorse might affect his sentence, his willingness to admit the crime might offer the sentencing judge some guidance. But with the inducement of a lighter sentence dangled before him, the sincerity of any cries of *mea culpa* becomes questionable. Moreover, the refusal of a defendant to plead guilty is not necessarily indicative of a lack of repentance. A man may regret his crime but wish desperately to avoid the stigma of a criminal conviction.[33]

The Supreme Court was careful to point out in Sherbert v. Verner that "no showing merely of a rational relationship to some colorable state interest would suffice" to justify an infringement of First Amendment rights.[34] Even if we assume that the right to a fair trial may in some circumstances be made costly, the required justification here also must be a paramount goal achievable in no other way. The supposed value of a guilty plea in demonstrating repentance does not meet this test.

The second argument for differential sentencing is necessity. Most convictions, perhaps as many as 90 per cent in some jurisdictions, are the product of guilty pleas.[35] Unless a large proportion of defendants plead guilty, the argument runs, the already crowded dockets in many jurisdictions would collapse into chaos. Since most defendants are indigent, the only price they can be forced to pay for pleading innocent is time in jail. Ergo, differential sentences are justified for those who plead guilty and those who plead innocent.

When approached from this perspective, the problem inevitably becomes entwined with that of plea bargaining. And the difficulties that practice presents are exceeded only by its pervasiveness. In many areas such bargaining dominates the criminal process. Its format may vary. The prosecutor may agree to reduce the charge in exchange for a guilty plea, or he may agree to recommend a lighter sentence. The judge may be aware of the agreement or he may not. If aware that a bargain has been struck, the court may or may not ratify the agreement before a plea is offered and accepted.

When a defendant pleads guilty in exchange for the promise of the prosecutor or court, a subsequent challenge to the voluntariness of his plea raises a recognized constitutional issue. When the accused refuses to plead guilty and subsequently receives a heavier sentence, the invisibility with which the system operates in individual cases too often conceals the constitutional issue. But the problem is the same in both contexts. Whether the defendant surrenders his right to a trial because of a bargain with court or prosecutor, or exercises his right at the cost of a stiffer sentence, a price has been put on the right.

The two sides of this coin are related in a practical sense as well. At least when only a single charge is involved, the effectiveness of plea bargaining depends upon the willingness of the court

---

33. In fact, a colorable argument can be made that a glib willingness to admit guilt in order to "secure something in return" may indicate quite the opposite of repentance, and that a reluctance to admit guilt may in fact reflect repentance. *See* Alschuler, The Prosecutor's Role in Plea Bargaining, 36 U.Chi.L. Rev. 50, 57 n. 24 (1968).

34. 374 U.S. at 406, 83 S.Ct. at 1795.

35. *See* The President's Comm'n on Law Enforcement and Administration of Justice, Task Force Report: The Courts 9 (1967) [hereinafter Task Force Report]; D. J. Newman, Conviction: The Determination of Guilt or Innocence Without Trial 3 n. 1 (1966).

to impose a lighter sentence when a defendant pleads guilty. If such is the custom within a jurisdiction, the prosecutor enjoys credibility. Indeed, if the custom is sufficiently well known, actual bargaining may be unnecessary: enough defendants will be cowed into guilty pleas simply by the force of their lawyers' warnings that defendants convicted after demanding a trial receive long sentences.[36]

Thus, to the extent that the appellant here received a longer sentence because he pleaded innocent, he was a pawn sacrificed to induce other defendants to plead guilty. Since this is so, to consider the price he paid for the exercise of his right without regard for the process of which it is but one instance would be to ignore reality.

The debate surrounding differential sentencing and plea bargaining involves two issues that should be separated. The first concerns what inducements for guilty pleas should be permitted; the second involves the question of who should be allowed to offer these inducements to the accused. Both questions must be resolved to articulate a comprehensive standard of voluntariness. Unfortunately, the difficulty of the first question has tended to lure courts toward a one-sided focus upon the second.

The saga can best begin with the vicissitudes of J. Paul Shelton in the Fifth Circuit Court of Appeals and the Supreme Court. The maneuverings of that crafty litigator *pro se* have created "much of the current uncertainty about the legal status of plea discussions and plea agreements," [37] as the Fifth Circuit

has itself acknowledged.[38] Shelton pleaded guilty to transporting a stolen vehicle. He later moved to vacate the conviction on the ground that his plea was involuntary, having been induced by a promise of the prosecutor to recommend the one-year sentence he in fact received. The District Court denied the motion. The Court of Appeals reversed, holding that a plea induced by a promise of leniency was involuntary as a matter of law, whether or not the promise was kept.[39]

The opinion by Judge Rives for the majority equated a plea of guilty with a confession in open court, and concluded that the same strict test of voluntariness should be applied to guilty pleas as to confessions. Judge Tuttle dissented, arguing that the majority position "would considerably impede the administration of justice" by rendering prosecutors unable to offer sufficient "inducements for any person to plead guilty." [40]

When the case was reheard en banc, the dissenting opinion of Judge Tuttle became the majority position.[41] The test of voluntariness that he had formulated for guilty pleas,[42] and that the full court adopted,[43] was essentially one requiring an informed choice, although perhaps one between unattractive alternatives:

[A] plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their

36. *See* Pilot Institute on Sentencing, 26 F.R.D. 231, 289 (1959).

37. PLEAS OF GUILTY 64.

38. Brown v. Beto, 377 F.2d 950, 953 (5th Cir. 1967).

39. Shelton v. United States, 242 F.2d 101, 112–113 (5th Cir.), rev'd on rehearing, 246 F.2d 571 (1957) (en banc), rev'd 356 U.S. 26, 78 S.Ct. 563, 2 L.Ed.2d 579 (1958) (per curiam).

40. *Id.* at 115 (dissenting opinion).

41. Shelton v. United States, 246 F.2d 571 (5th Cir. 1957), rev'd 356 U.S. 26, 78 S. Ct. 563, 2 L.Ed.2d 579 (1958) (per curiam).

42. 242 F.2d at 115 (dissenting opinion).

43. 246 F.2d at 572 n. 2.

nature improper as having no proper relationship to the prosectuor's business (e. g. bribes).

This test would tolerate some "commitments" by the prosecutor to induce a guilty plea, and apparently some by the court itself as well.

The Solicitor General confessed error when the *Shelton* case reached the Supreme Court on the ground that "the plea of guilty may have been improperly obtained," and the Court reversed the en banc decision of the Court of Appeals in a memorandum opinion.[44] The decision did not specify why or in what way the guilty plea might have been "improperly obtained," and therefore did not necessarily overrule the reasoning of the en banc decision below. Such, at least, has been the interpretation of the Fifth Circuit, which has continued to apply essentially Judge Tuttle's test of voluntariness.[45]

In the *Shelton* opinions the question of what bargains shall be permitted was squarely confronted, although inconclusively resolved. Recently the attention of the Fifth Circuit has moved to the second question involved in a determination of whether a plea is voluntary, that of who may offer the inducements or "commitments" permitted by the informed-choice model of voluntariness. Relying heavily upon the distinction drawn between the role of the trial judge and that of the prosecutor by the American Bar Association Project on Minimum Standards for Criminal Justice,[46]

the court concluded in Brown v. Beto[47] that (1) "Properly safeguarded plea discussions and plea agreements between an accused and a prosecutor are consistent with the fair administration of justice;"[48] but (2) "'The trial judge should not participate in plea discussions'"[49]

If inducements are to be offered for guilty pleas, there are strong reasons why the court should not be the party to offer them. The trial judge may sacrifice his ability to preside impartially at trial by becoming too involved with pre-trial negotiations. Even if he does not, it may so appear to the defendant. It is important not only that a trial be fair in fact, but also that the defendant believe that justice has been done. The accused may fairly doubt this if he thinks the judge begrudges him the exercise of his right to trial. Moreover, the defendant's uncertainty concerning the expectations or wishes of the judge will prevent his exercise of the best judgment in deciding upon a plea.

Judge Weinfeld has concluded in two careful opinions that whatever the propriety of plea bargaining between prosecutors and defendants, the peculiarly sensitive position of the trial judge renders involuntary any guilty plea induced by a commitment from the bench.[50] His vivid portrayal of the "unequal positions of the judge and the accused, one with the power to commit to prison and the other deeply concerned to avoid prison"[51] presents a compelling brief for demanding

44. Shelton v. United States, 356 U.S. 26, 78 S.Ct. 563, 2 L.Ed.2d 579 (1958) (per curiam).

45. *See, e.g.,* Cooper v. Holman, 356 F.2d 82 (5th Cir.), cert. denied, 385 U.S. 855, 87 S.Ct. 103, 17 L.Ed.2d 83 (1966); Busby v. Holman, 356 F.2d 75 (5th Cir. 1966); Sorrenti v. United States, 306 F.2d 236 (5th Cir. 1962), cert. denied, 373 U.S. 916, 83 S.Ct. 1306, 10 L.Ed.2d 416 (1963); Martin v. United States, 256 F.2d 345 (5th Cir.) (per Tuttle, C. J.), cert. denied, 358 U.S. 921, 79 S.Ct. 294, 3 L.Ed.2d 240 (1958).

46. PLEAS OF GUILTY 60–77.

47. 377 F.2d 950 (5th Cir. 1967).

48. *Id.* at 956.

49. *Id.* at 957 (quoting PLEAS OF GUILTY § 3.3(a)).

50. United States ex rel. Elksnis v. Gilligan, 256 F.Supp. 244 (S.D.N.Y.1966); United States v. Tateo, 214 F.Supp. 560 (S.D.N.Y.1963); *see also* Euziere v. United States, 249 F.2d 293 (10th Cir. 1957).

51. *Elksnis,* 256 F.Supp. at 254.

that the judge not become a participant in the bargaining process.

In this case the trial judge did not bargain with the defendant. Indeed he did not even point out that he might be more lenient with a defendant who pleaded guilty until after trial. But in so stating at the sentencing hearing he announced to all future defendants the guidelines in his court room. We cannot approve of these guidelines for the same reasons that we could not condone actual plea bargaining by a trial judge. The policy announced by the trial judge may not endanger his actual impartiality at trials as much as his participation in plea bargaining sessions might. And we certainly do not criticize the impartiality displayed by the experienced trial judge in this case. But we cannot ignore the impact of such a policy on the appearance of justice to criminal defendants and their ability to choose wisely between a plea of guilty and an exercise of their right to trial.

In recognizing that an announced policy of differential sentencing presents some of the same dangers as conventional plea bargaining, we do not, as the concurring opinion suggests, equate the two practices. Overt plea bargaining by a trial judge places direct and immediate pressure upon the defendant to forego his right to a trial. An announced policy of differential sentencing which distinguishes between defendants who demand a trial and those who do not presents an inducement to plead guilty which may be less coercive in the individual case, but which nevertheless must affect the decision to exercise the constitutional right to a trial.

## V

In announcing the rule that the trial judge should neither participate directly in plea bargaining nor create incentives for guilty pleas by a policy of differential sentences, we must at the same time point out that the trial judge cannot ignore the plea bargaining process. A guilty plea must be not only voluntary, but also knowing and understanding.[52] If the defendant has decided to admit his guilt because of a commitment from the prosecutor, it is essential for the validity of his plea that he have a full and intelligent understanding of the nature and extent of that commitment. To fulfill the requirement of Rule 11[53] and insure that a plea is made only "after proper advice and with full understanding of the consequences,"[54] the trial judge must make certain that the defendant has made a knowing appraisal of the alternatives open to him.[55]

There is no justification for a courtroom charade in which the judge asks whether a plea has been induced by any promises, and the defendant replies that it has not, when all the actors realize that quite the contrary is true.[56] Rule

---

52. *See id.* at 255 and n. 48.

53. Rule 11 of the Federal Rules of Criminal Procedure, as amended in 1966, provides in relevant part:
 The court * * * shall not accept * * * [a plea of guilty] without first addressing the defendant personally and determining that the plea is made voluntarily with understanding of the nature of the charge and the consequences of the plea.

54. Kercheval v. United States, 274 U.S. 220, 223, 47 S.Ct. 582, 583, 71 L.Ed. 1009 (1927).

55. *See* Bailey v. MacDougall, 392 F.2d 155 (4th Cir. 1968); United States ex rel. McGrath v. LaVallee, 348 F.2d 373 (2d Cir. 1965), cert. denied, 383 U.S. 952, 86 S.Ct. 1214, 16 L.Ed.2d 214 (1966).

56. The somewhat bemused comments of one sociologist observing the legal process indulging its penchant for reality-denying ritual are worth repeating:
 Apparently, however, there is some tension between the face of bargaining and moral expectations concerning justice. * * * A clear example of this tension is provided by an excerpt from a trial and Newman's comments on it.
 The following questions were asked of a defendant after he had pleaded guilty to unarmed robbery when the original charge was armed robbery. This re-

11 requires a full scrutiny of the circumstances surrounding a plea, and promises from the prosecutor do count. Moreover, if it is indeed proper for the prosecutor to make commitments to the defendant in exchange for a plea of guilty, there seems no reason why the judge should not be allowed to permit the defendant to know the value of the prosecutor's promises before entering his plea. The Second Circuit has recognized the force of this argument. In United States ex rel. Rosa v. Follette,[57] the trial judge had forthrightly told the defendants that the sentence recommended by the prosecutor would be accepted by the court if they pleaded guilty. The court noted that since "it is clear that the plea discussions were between the prosecutor and [the defendants] * * * [,] in no meaningful sense can [the judge] be said to have participated in the negotiations."[58] Refusing to conclude that the mere "tangential" participation of the judge represented by his ratification of the agreement tainted the plea, the appellate court concluded, "In the instant case, [the defendants were] fortunate in being given the security of the Judge's beneficence by learning immediately what most defendants are tortured over, can only hope for and anticipate—that the trial judge will follow the prosecutor's recommendation."[59] The Sixth Circuit has relied

upon essentially the same reason in declining to set aside a sentence in Waddy v. Heer,[60] distinguishing Judge Weinfeld's decisions in *Tateo* and *Gilligan* as cases where the judge took part in actual negotiations rather than merely ratifying an agreement between the prosecutor and defendant.

The line may well be a fine one between a trial judge "participating" in the plea bargaining process and a judge merely "ratifying" an agreement already reached between the accused and the prosecutor. But the likelihood that the judge will overawe the defendant or surrender his impartiality is at least sharply reduced if he does not play a role in the negotiations leading to the formation of a bargain.

The fact that the trial judge must be aware of any bargain made before accepting a plea of guilty, and perhaps may ratify the agreement in appropriate circumstances, imposes an obligation upon the judge to supervise the fairness of the bargain. Since the trial judge determines the sentence a convicted defendant will receive, he cannot escape this responsibilty if plea bargaining takes the form of a promised sentence recommendation. But the functional problem is the same if plea bargaining takes the form of a prosecutorial offer to reduce the charge, as seems to

---

duction is common, and the judge was fully aware that the plea was negotiated:

Judge: You want to plead guilty to robbery unarmed?
Defendant: Yes, sir.
Judge: Your plea of guilty is free and voluntary?
Defendant: Yes, sir.
Judge: No one has promised you anything?
Defendant: No.
Judge: No one has induced you to plead guilty?
Defendant: No.
Judge: You're pleading guilty because you are guilty?
Defendant: Yes.
Judge: I'll accept your plea of guilty to robbery unarmed and refer it to the probation department for a report and for sentencing Dec. 28.

[D. J. Newman, Conviction: The Determination of Guilt or Innocence Without Trial 83 (1966)].
* * * Newman's comment on this exchange has an Alice-In-Wonderland quality:
This is a routine procedure designed to satisfy the statutory requirement and is not intended to disguise the process of charge reduction.
Scheff, Negotiating Reality: Notes on Power in the Assignment of Responsibility, 16 SOCIAL PROBLEMS 1, 5 (1968).

57. 395 F.2d 721 (2d Cir. 1968).

58. *Id.* at 725.

59. *Id.* at 726.

60. 383 F.2d 789, 793 (6th Cir. 1967). *See also* TASK FORCE REPORT 12; PLEAS OF GUILTY 71–77.

be the practice in the District of Columbia.[61] By deciding what charge or charges to proceed with, the prosecutor can often effectively control the sentence the defendant is likely to receive. To the extent this decision is made independently by the prosecutor before the defendant is called upon to plead, there is no danger that the defendant will be deterred from exercising his right to trial. When, however, the prosecutor makes his decision by offering to reduce the charge in exchange for a plea of guilty, the situation is quite different. If the trial judge is to so supervise the bargain, the law must resolve the troubling issue left in limbo by the Shelton opinions: what inducements to plead guilty are permissible? Since this case does not present that issue, it would be inappropriate to essay a comprehensive answer to the question. Because the problem is so closely entwined with the policy of differential sentencing, however, several brief comments are in order.

First, the prosecutor clearly cannot have carte blanche to apply whatever tactics he wishes to induce a guilty plea. A policy of deliberately overcharging defendants with no intention of prosecuting on all counts simply in order to have chips at the bargaining table would, for example, constitute improper harassment of the defendant.

Second, there may be circumstances under which the prosecutor may bargain with the defendant without raising the constitutional question of whether the exercise of the right to trial can be made costly. When there is substantial uncertainty concerning the likely outcome of a trial, "each side is interested in limiting these inherent litigation risks."[62] The prosecutor may be willing to accept a plea of guilty on a lesser charge rather than chance an acquittal on the more serious. The accused may be similarly willing to acknowledge his guilt of the lesser charge rather than risk conviction on the more serious, or to accept the promise of a lighter sentence to escape the possibility of conviction after trial and a heavier sentence.

Superficially it may seem that even in such a case the defendant who insists upon a trial is found guilty pays a price for the exercise of his right when he receives a longer sentence than his less venturesome counterpart who pleads guilty. In a sense he has. But the critical distinction is that the price he has paid is not one imposed by the state to discourage others from a similar exercise of their rights, but rather one encountered by those who gamble and lose. After the fact, the defendant who pleads innocent and is convicted receives a heavier sentence. But, by the same token, the defendant who pleads innocent and is acquitted receives no sentence. To the extent that the bargain struck reflects only the uncertainty of conviction before trial, the "expected sentence before trial"—length of sentence discounted by probability of conviction—is the same for those who decide to plead guilty and those who hope for acquittal but risk conviction by going to trial.

In determining who has or has not "paid a price," it is essential to reason clearly concerning what class of defendants are being compared with what other class of defendants for what purpose and at what point in time. The danger presented by plea bargaining is that defendants deciding upon a plea will be deterred

---

61. For a partial account of the process in the District of Columbia which nevertheless suggests the complexity of the problem, see H. I. Subin, CRIMINAL JUSTICE IN A METROPOLITAN COURT 15–17, 34–35, 37–38, 42–50 (1966).

62. See TASK FORCE REPORT 10. One commentator well-versed in the realities of plea-bargaining has labeled the problem as one of "variable guilt": "Justice does not flow readily from a computer where the survivor of a fight and witnesses at the taproom relate stories which indicate, in variable quantities, the facts of intoxication, provocation, malice aforethought and self-defense." Specter, Book Review, 76 YALE L.J. 604, 606 (1967). See also Alschuler, The Prosecutor's Role in Plea Bargaining, 36 U.CHI.L.REV. 50, 81 & n. 71 (1968); Weinberg & Babcock, Book Review, 76 YALE L.J. 612, 620–621 (1967).

from exercising their right to a trial. The relevant vantage point is thus before trial, and the relevant comparison is between the expectations of those who decide to insist upon a trial and those who decide to eliminate the risk of trial by pleading guilty. If the sentence expectations of those two classes at that time are the same, then there will be no chilling effect upon exercise of the right to trial, and it is accurate to say that no "price" has been placed upon exercise of the right.

To determine the expectations of those defendants who insist upon a trial, we must consider the probability of conviction as well as the sentences received by those who plead innocent and are later convicted. The argument that the defendant who receives a heavier sentence after trial has "paid a price" because he receives a heavier sentence than the defendant who is acquitted (and goes free) or pleads guilty (and receives a shorter sentence on the same or a reduced charge) errs on two counts: (1) the comparison is made at the wrong time—after trial, when the uncertainty of litigation has passed, rather than before trial—and (2) the comparison is made between the wrong categories of defendants—the class of defendants convicted after trial versus the class of defendants who plead guilty or are acquitted rather than the class of defendants who exercise their right to trial versus the class of defendants who do not.

 The situation is quite different when the prosecutor engages in bargaining not because he is willing to take a sure half loaf rather than to await the outcome of a trial, but because his limited resources convince him he must deter defendants from demanding a trial.[63] The divide between the two situations may be difficult to locate for even the best-intentioned prosecutor, and even more difficult for a trial judge to review. But the standards which guide prosecutors in the exercise of their discretion are as much a part of the law as the rules applied in court. Indeed, the impact of such standards is more decisive for many defendants than that of any other legal rules. If "it is procedure that spells much of the difference between rule by law and rule by whim or caprice,"[64] the same or more can be said of well-articulated, evenly-applied standards for prosecutorial discretion. If we must as a practical matter rely upon prosecutors to apply these standards in good faith, the responsibility for articulating appropriate standards must belong to the courts, not prosecutors. The nature of the process may well prevent judges from actually reviewing specific instances of prosecutorial discretion in all but the most exceptional cases. But this reality imposes a special duty upon courts to provide what guidance they can for prosecutors entrusted with such discretion. In the area of plea bargaining, the lodestar must be the realization that our law solemnly promises each man accused his day in court. If a prosecutor enters plea and charge negotiations not with the purpose of adjusting the charge to reflect the uncertainties of litigation but with the goal of deterring the defendant from

63. We do not, of course, suggest that a prosecutor can or should ignore resource limitations in deciding which cases to prosecute. Prosecutors cannot pursue every case to a jury verdict. In deciding which cases or charges to drop or reduce, prosecutors must and do consider such factors as the strength of the evidence, aggravating or extenuating circumstances surrounding the offense, and so forth. But it is one thing to use such criteria to tailor docket loads to available resources without consulting the defense, and quite another to combat crowded dockets by confronting individual defendants with the threat that they can demand a trial only at the cost of risking conviction for a more serious charge or, what is of course the same thing, foregoing the "leniency" of a "lighter" charge that would be available in exchange for a guilty plea.

64. Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 179, 71 S.Ct. 624, 652, 95 L.Ed. 817 (1951) (concurring opinion of Douglas, J.).

the exercise of his right to a trial, the chasm between promise and reality is no narrower because the trial court affects a righteous air of non-involvement. Perhaps the promise must be tempered if society is unwilling to pay its price. But that decision should be made in sunlight, and not in the shrouded mist of unguided prosecutorial discretion.

The arguments that the criminal process would collapse unless substantial inducements are offered to elicit guilty pleas have tended to rely upon assumption rather than empirical evidence. In many jurisdictions lacking sophisticated resources for criminal investigations, a large proportion of suspects apprehended are caught virtually red-handed.[65] The argument "But what if everyone did not plead guilty?" has force only to the extent that a sizable proportion of defendants have some motivation to plead innocent. If the defendant does have some hope of acquittal, the right to a trial assumes overarching importance. If he does not, there is some presumption that most men will not indulge in a meaningless act.[66] Moreover, the plea bargaining system itself may actually operate in some instances to burden the docket rather than to lighten it.[67]

If in fact more defendants wish to demand trials than our present system can process, there are two solutions: deter exercise of the right to trial, or commit more resources to the criminal process. This case does not require us to decide whether inadequate resources may constitutionally justify the former course. But we do think it important to phrase the question in the straightforward fashion of whether the cost of honoring a constitutional right can justify making the exercise of that right costly to the individual. The temptation is strong in the area of plea bargaining to assume that defendants convicted after trial receive a "normal" sentence while those who plead guilty and save the Government the cost of a trial receive special "leniency" in exchange. If this analysis were valid, some defendants would win and none would lose. But in reality there are winners and losers. The "normal" sentence is the average sentence for all defendants, those who plead guilty and those who plead innocent.[68] If we are "lenient" toward the former, we are by precisely the same token "more severe" toward the latter.[69]

65. See PRESIDENT'S COMM'N ON LAW ENFORCEMENT AND ADMINISTRATION OF JUSTICE, THE CHALLENGE OF CRIME IN A FREE SOCIETY 96–97 (1967); see also, Comment, Interrogations in New Haven: The Impact of Miranda, 76 YALE L.J. 1519, 1588–1589 (1967).

66. The counter argument, of course, is that the defendant has "nothing to lose" by demanding a trial. If this is true, and if enough defendants would demand a useless trial simply out of spite—or perhaps hope of remaining free on bail until trial—that only poses the question of why we should deter defendants from demanding a useless trial by threatening them with additional months or, more commonly, years in jail (whether through longer sentences or conviction on more serious charges). If the trial is truly useless, we should be able to induce guilty pleas with a much smaller stick—perhaps a small bribe for a guilty plea or fine for an innocent plea. But, of course, as the concurring opinion recog-

nizes, a bribe would be an impermissible tactic to induce guilty pleas. And a fine imposed upon defendants who insist upon trial would be no more acceptable. The interesting question is why a literal price-tag upon the right to trial is offensive to our concepts of due process, while the figurative pricetag of time in jail is acceptable. The answer may well be in the tendency to define due process by past process.

67. See Alschuler, The Prosecutor's Role in Plea Bargaining, 36 U.CHI.L.REV. 50, 65 & n. 44, 103, 104 & n. 131 (1968).

68. For a slightly more refined analysis, which does not affect the thrust of the reasoning here, see text supra at p. 23.

69. The all-winners-no-losers analysis succeeds only if we "indulge an operating presumption of the defendant's guilt." Cf. Weinberg & Babcock, Book Review, 76 YALE L.J. 612, 617 (1967). If all defendants were guilty, we would not need to consider the possible chilling ef-

Conviction affirmed; remanded for re-sentencing.

J. SKELLY WRIGHT, Circuit Judge (concurring):

I concur in the result in this case, and in Parts I through IV of Judge Bazelon's opinion. However, I disagree in some respects with the discussion in Part V of that opinion, and therefore I set forth my own views.

In Part V two separate questions are considered: (1) to what extent should the judge become involved in the bargaining; and (2) what bargains by the prosecutor should be allowed. I shall discuss each separately.

## I

It is clear that if the judge takes his role under Rule 11, Fed.R.Crim.P., seriously he must inquire into the circumstances of the bargaining between the prosecutor and the defendant. It would only heighten the already unfortunate invisibility of the bargaining process—and weaken respect for the courts—if the judge and the parties pretended that no bargaining had occurred when they all knew that it had. However, as Judge Bazelon notes in Part IV of his opinion, the judge cannot be a participant in the bargaining. The question narrows, therefore, to the extent to which the judge should inquire into and ratify the bargain struck by the prosecutor and the defendant.

Judge Bazelon would follow the Second Circuit's approach in United States ex rel. Rosa v. Follette, 395 F.2d 721 (1968). I disagree with the extensive dicta in that case to the effect that a judge can tell a defendant before the defendant decides to plead guilty that if he so pleads he will be given the sentence offered by the prosecutor as the bargain for the plea.[1] Considering the relative positions of the judge and the accused, I cannot see how ratifying the prosecutor's bargain is less coercive on the accused than if the judge participated in the bargaining from the beginning. What Judge Weinfeld said in United States ex rel. Elksnis v. Gilligan, S.D. N.Y., 256 F.Supp. 244, 254 (1966), is applicable to such a situation:

"The unequal positions of the judge and the accused, one with the power to commit to prison and the other deeply concerned to avoid prison, at once raise a question of fundamental fairness. When a judge becomes a participant in plea bargaining he brings to bear the full force and majesty of his office. His awesome power to impose a substantially longer or even maximum sentence in excess of that proposed is present whether referred to or not. A

fect upon exercise of the right to trial, since upon this assumption there are no innocent defendants for whom the right to trial is important. In this improbable world, if we make the additional assumption that the sentences meted out in the absence of a plea bargaining system would be the same as those meted out after trial in a system characterized by plea bargaining, it might be accurate to say that the defendant who is allowed to "cop" a plea to a less serious charge "wins," while the (by hypothesis guilty) defendant convicted after trial is no worse off than he would be in the absence of a plea bargaining system. The assumption that all defendants are guilty is, of course, ludicrous if made in an absolute sense. But if one believes that as a factual matter a large majority of defendants are guilty, there may be a temptation to conclude that the lighter

charges obtained by many guilty defendants in exchange for a plea outweighs by far the cost imposed upon the occasional defendant with a nonfrivolous defense who must risk a heavier sentence by going to trial. Regardless of whether one accepts the sort of calculus implicit in this reasoning, in evaluating the validity of the factual assumption upon which it is premised—that most defendants are guilty—allowance should be made for the likelihood that the operation of a plea bargaining system will reduce the number of defendants actually innocent in fact or law who ever reach trial.

1. The actual facts in that case showed that the defendant had decided to enter his plea *before* the judge announced that he would follow the prosecutor's recommended sentence.

defendant needs no reminder that if he rejects the proposal, stands upon his right to trial and is convicted, he faces a significantly longer sentence. * * Intentionally or otherwise, and no matter how well motivated the judge may be, the accused is subjected to a subtle but powerful influence. A guilty plea predicated upon a judge's promise of a definite sentence by its very nature does not qualify as a free and voluntary act. * * *

"A judge's prime responsibility is to maintain the integrity of the judicial system; to see that due process of law, equal protection of the laws and the basic safeguards of a fair trial are upheld. The judge stands as the symbol of evenhanded justice, and none can seriously question that if this central figure in the administration of justice promises an accused that upon a plea of guilty a fixed sentence will follow, his commitment has an all-pervasive and compelling influence in inducing the accused to yield his right to trial. * * *" (Footnotes omitted.)

I would restrict the judge's role under Rule 11 to determining, by an on-the-record investigation, the voluntariness of the plea bargain. One who is a party to a bargain is hardly in the best position to determine its fairness and voluntariness by making "a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered." Von Moltke v. Gillies, 332 U.S. 708, 724, 68 S.Ct. 316, 323, 92 L. Ed. 309 (1948).

II

Turning to the question of what bargains should be allowed between the prosecutor and the defendant, I would adopt an approach similar to that taken by Judge Tuttle in Shelton v. United States, 5 Cir., 242 F.2d 101, 115 (dissenting opinion), *reversed*, 5 Cir., 246 F.2d 571 (1957) (*en banc*), *reversed on confession of error*, 356 U.S. 26, 78 S.Ct. 563, 2 L.Ed.2d 579 (1958):

" * * * [A] plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the * * * prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e. g. bribes). * * *"

I would thus allow the prosecutor to bargain with counsel for the accused. Other than complying with their Rule 11 obligation as indicated in Part I, courts should intervene only where the prosecutor has exceeded "proper" bounds. Judge Bazelon would attempt to narrow the permissible bargains by allowing the prosecutor to offer concessions when based on an estimate of the outcome of a trial, but not allow the prosecutor to offer concessions when based on other motives, for example a desire to unclog overcrowded dockets. I think it unlikely that courts can oversee the motives of the prosecutor to such a refined degree. Further, this would result in the anomalous situation wherein, since greater concessions would be offered only to those defendants with the best chance of acquittal, trials would tend to be limited to open-and-shut cases against the defendants.

Judge Bazelon argues that somehow no "cost" is imposed on a defendant who rejects a plea bargain based on estimated trial outcome and goes to trial. I fail to see this. A defendant who rejects the offer to plead guilty to manslaughter and is convicted on the murder charge has obviously paid a price. The fact that the motive behind the prosecutor's concession is docket-clearing should not preclude bargaining. Defendants, provided they bargain knowingly, and with the effective assistance of counsel, should be allowed to take advantage of this consideration impelling the prosecution to offer leniency.

In sum, if the court keeps the prosecutor within proper bounds in the sense discussed above, the parties should be allowed to bargain freely. The judge, by bringing to the surface the conditions of the bargain, can properly oversee the process. The result will be to give the courts a more extensive knowledge of the workings of this heretofore low-visibility process, and thus allow the courts to refine their supervisory standards.

LEVENTHAL, Circuit Judge (concurring in the judgment):

While I concur in the affirmance of the conviction, and the remand for resentencing, I do not join in the opinions of Judge Bazelon (in which Judge Wright largely joins) or of Judge Wright.

1. I concur in remand for resentencing because the sentencing transcript makes it reasonably clear that the trial judge's conclusion that the maximum 5–15 year term was appropriate for appellant's robbery of a bus driver with a toy pistol when 18 years old in essence represented a response to the fact that defendant (falsely) asserted his innocence at trial and persisted in asserting his innocence in the course of his allocution. I base this conclusion on the sentencing transcript concerning both appellant [1] and his co-defendant Alston.[2]

1. While the essential facts are summarized in Judge Bazelon's opinion, the full sentencing transcript reenforces this conclusion. Scott produced the letter after hearing the trial judge say that the sentence imposed would be compatible with sentences imposed in other cases. "I have to think of those other men I imposed sentences of five to fifteen years, four to twelve, etc. What would they think if I gave him a light sentence?" (Tr. 10) "Now in view of his attitude and in view of the fact that he lied on the stand, * * * [t]he only thing I will recommend in this case is that he be sent to an institution where young offenders are confined so he might learn a trade and maybe in four or five years he might become a useful citizen."

When the judge's law clerk was called to the stand, he said: "I told [defense] counsel that I had heard you mention in court * * * that you are waiting for the day when someone would come into this court and say they were guilty at sentence, that when a jury finds a man guilty and it is clear a man is guilty they only do themselves a disservice by maintaining they are innocent, and consequently it has always been my opinion you view sentencing differently when someone admits guilt rather than maintaining innocent." (Tr. 16–17)

The court's confirmation ran (Tr. 18–20): "I have said more than one time, I have said it in open court, it is a strange thing to me that a defendant who comes up after getting the benefit of good representation, trial before jury, the evidence being overwhelming as it is in this case, I hope sometime I hear some defendant say, 'Judge, I am sorry, I am sorry for what I did.' That is

what I have in mind. * * * I didn't tell [the clerk] or anyone else I would throw the book at [defendant] or anyone else if he didn't come up to confess. * * * He has a perfect right to maintain his innocence from now to eternity if he wants to. I am doing what I think is right."

2. At the outset, the judge, in addressing Scott, noted as to Alston: "The other boy at least pleaded guilty after he heard the government's evidence—threw the sponge in, so to speak—because he knew he didn't have a chance." (Tr. 7) Later Alston said he pleaded guilty "because I was scared and there was a crime that I didn't do but if I had went on and kept on fighting the case then I would get a lot of time and I thought I'd get probation." (Tr. 23) Alston's counsel, from the Legal Aid Agency, testified that he told Alston the chances of acquittal were almost non-existent— "that if he were in fact guilty that he should enter a plea of guilty because, (1) I thought he should not lie in court, and (2) I thought that his sentence would in all likelihood be lighter if he entered a plea if he were guilty rather than go ahead with full trial. And after informing him of this he told me he wished to plead guilty." (Tr. 24) Alston later sought to withdraw his plea, and said he had been "promised probation" by the police officer, and his lawyer; his lawyer flatly denied this. The court said: "I was going to be a little bit lenient with Alston this morning but in view of his attitude and in view of the fact that the Court feels he is deliberately lying to me. * * * I am not going to give him any consideration, frankly." (Tr. 29)

It is not easy for me to define why I concur in a judgment of remand. There is a natural, and I believe sound, disposition to adjust sanctions when an offender admits his responsibility. This blends in with a readiness to accept the conclusion that such a person has the stuff that portends future improvement. I dare say that many judges, possibly the overwhelming majority, respond in this way, and I am not ready, at least as of this writing, to say that their approach is inadmissible. The wellsprings of human experience are known to every parent concerned with bringing up children, and who has invoked, consciously or not, Parson Weems' account of George Washington and the cherry tree.

What we have before us is the difference of degree that amounts to a difference in kind. There is a line between responding favorably to an individual's sincere expression of remorse, and reacting in a hostile way because of a personal belief in the guilt of one who maintains his innocence and seeks review of the judgment. There are elements in the present case that betoken reversible prejudice in my mind because of the nature of the proceeding and the judge's comments (*see supra* notes 1 and 2). Taking the matter as a whole I conclude that the sentence did not reflect an individuated judgment as to the balance of deterrence and rehabilitation

applicable in appellant's case so much as a broader approach of using a maximum sentence for a defendant who (falsely) asserts his innocence.[3]

Since that is a sentencing approach that in effect penalizes a defendant for preserving his right of appeal, it cannot be regarded as consistent with law, and the sentence must be vacated. Thomas v. United States, 368 F.2d 941 (5th Cir. 1966).

2. However, I limit my concurrence to that point. Chief Judge Bazelon has seen fit to expatiate on problems of validity in a system providing lighter sentences for defendants pleading guilty. His wide-ranging remarks are not only dictum, but obiter.

This is not one of those cases where a point needs making albeit technically dictum, because it is reasonably clear and the underlying principle is one that illuminates the territory of the holding. I do not pretend to have studied this matter either at the length or in the depth it merits. I am fortified in my resistance to acquiescence in the obiter dicta, on matters neither argued nor considered by the court as a whole, by the fact that the discourse of my brethren seems to me to depart significantly from the conclusions expressed in STANDARDS RELATING TO PLEAS OF GUILTY.[4]

This report of the distinguished Advisory Committee on the Criminal Trial,[5]

---

3. Comment may be appropriate concerning the judge's remark (quoted *supra*, note 1) that considerations of equality dictate the same sentence given other defendants. While this consideration may have pertinence, it is of course subject to the overriding consideration that the sentencing discretion is given to the trial judge precisely so that different sentences may be meted out to different offenders, though all are convicted of the same crime. There is a real inequality—notwithstanding the surface uniformity—in according the same disposition to persons different in essential characteristics, as was noted long ago by Aristotle, and more recently by the PRESIDENT'S COMMISSION ON LAW ENFORCEMENT AND ADMINISTRATION OF JUSTICE. See its report, THE CHALLENGE OF CRIME IN A FREE SOCIETY (Feb.1967) at 1 and 141.

4. REPORT OF THE ADVISORY COMMITTEE ON THE CRIMINAL TRIAL (Tentative Draft, February 1967). AMERICAN BAR ASSOCIATION PROJECT ON MINIMUM STANDARDS FOR CRIMINAL JUSTICE. This report was adopted by the House of Delegates, with minor amendments to §§ 2.1 and 3.3, in the February 19–20, 1968, meeting.

5. Chairman: Associate Justice Walter V. Schaefer, Supreme Court of Illinois. Members: U.S. District Judge Leo Brewster (N.D.Texas); Prof. Livingston Hall, Harvard Law School; U.S. District Judge Walter E. Hoffman (E.D.Va.); Chief Justice Frank R. Kenison of New Hampshire; Messrs. Charles B. Murray of Washington, D. C. (former Director

aided by a capable reporter, that has appeared as part of the AMERICAN BAR ASSOCIATION PROJECT ON MINIMUM STANDARDS FOR CRIMINAL JUSTICE, represents a measured reflection, and "intensive consideration" at numerous meetings over 18 months. That report sets forth in section 1.8:

1.8 Consideration of plea in final disposition.

(a) It is proper for the court to grant charge and sentence concessions to defendants who enter a plea of guilty or nolo contendere when the interest of the public in the effective administration of criminal justice would thereby be served. Among the considerations which are appropriate in determining this question are:

(i) that the defendant by his plea has aided in ensuring the prompt and certain application of correctional measures to him;

(ii) that the defendant has acknowledged his guilt and shown a willingness to assume responsibility for his conduct;

(iii) that the concessions will make possible alternative correctional measures which are better adapted to achieving rehabilitative, protective, deterrent or other purposes of correctional treatment, or will prevent undue harm to the defendant from the form of conviction;

(iv) that the defendant has made public trial unnecessary when there are good reasons for not having the case dealt with in a public trial;

(v) that the defendant has given or offered cooperation when such cooperation has resulted or may result in the successful prosecution of other offenders engaged in equally serious or more serious criminal conduct;

(vi) that the defendant by his plea has aided in avoiding delay (including delay due to crowded dockets) in the disposition of other cases and thereby has increased the probability of prompt and certain application of correctional measures to other offenders.

(b) The court should not impose upon a defendant any sentence in excess of that which would be justified by any of the rehabilitative, protective, deterrent or other purposes of the criminal law because the defendant has chosen to require the prosecution to prove his guilt at trial rather than to enter a plea of guilty or nolo contendere.

The Commentary following this black letter presentation reflects the careful analysis and attention given this difficult matter.

Certainly if a sentencing judge takes into account as a material, though not necessarily decisive, consideration the fact that a defendant "has acknowledged his guilt and shown a willingness to assume responsibility for his conduct" there is no sound objection to disclosure of this attitude. Judge Bazelon says that the making of such a general announcement cannot be approved for the same reasons that a court could not condone actual plea bargaining by a trial judge. With all respect this seems to me to exalt the form of logic over its substance, and to disregard common sense.

I do not deny that there are problems underlying leniency for those who acknowledge responsibility for guilt. The report released in 1967 by the PRESIDENT'S COMMISSION ON LAW ENFORCEMENT and ADMINISTRATION of JUSTICE ac

of the Legal Aid Agency for the District of Columbia); John M. Price, District Attorney, Sacramento County, California; Frank G. Raichle, Buffalo, New York (former president, American College of Trial Lawyers); Earl T. Thomas, Jackson, Mississippi (former state circuit judge); and William F. Tompkins, Newark, New Jersey (former U.S. Assistant Attorney General).

knowledge the existence of such problems, and the dangers of crossing the line that penalizes a man for going to trial and appeal. Yet on balance it concludes that sound principles of judicial administration warrant continued use of a system of negotiated pleas, with remedy against perceived abuses lying along lines of enhanced disclosure rather than concealment of sentencing criteria.[6]

This matter was also discussed in the 1966 REPORT OF THE PRESIDENT'S COMMISSION ON CRIME IN THE DISTRICT OF COLUMBIA (D.C. Crime Report).[7] That Commission stated that the data for the 1950–65 period, and specifically the 1964–65 year, show that offenders who pleaded guilty were more likely to receive a milder sentence than those who were tried. My own impression is that the underlying statistical data, which consisted of averages of sentences for all crimes lumped together, were too gross to permit discriminating evaluation. But in any event the Commission did not dismiss as frivolous or objectionable the point that sentencing could properly take into account the consideration that an offender demonstrates remorse. It rather was concerned that the primary stimulus to leniency in cases of guilty plea was a general motivation to expedite processing of the calendar, skimping the task of individuating punishment to the condition of the offender, and it observed that the mere existence of a plea of guilty does not establish reformative or rehabilitative potentiality.

I see no point in further recourse on my part to the literature. I have said enough, I think, to make it clear that the kind of territory traversed in Judge Bazelon's opinion is not mapped best with philosophical obiter, but is better tracked either in the train of adversarial adjudication, after brief and argument, or in the broader survey that can be approached in the judicial branch only by recourse at least to all active circuit judges, meeting as the Judicial Council, or the active circuit and district judges assembled as the Executive Session of the circuit's Judicial Conference.

3. I turn now to the subject of "plea bargaining" by the prosecutor. My objection here to Judge Bazelon's recourse to obiter for a discourse is heightened by the fact that I see no indication that we are confronted with grievous conditions that impelled a reaching out in order to protect the fabric of administration of justice in the District of Columbia.

The prosecutor "is, in many courts, empowered or even required to make sentencing recommendations. Much more often than not such recommendations are given great weight by judges."[8] Whatever conditions may be elsewhere, the U. S. District Judges in the District of Columbia do not seek or receive any recommendations by prosecutor as to sentences. A defendant who pleads guilty instead of going to trial does not even know which district judge will be assigned the matter for sentencing, since this is governed by a rotation plan instituted last year to avoid judge shopping, in accordance with a recommendation appearing in the D. C. Crime Report (at 389). I do not say this system is necessarily optimum, but certainly it avoids evils of plea bargaining identified in other localities.

Available data indicate that our jurisdiction is if anything particularly unlikely to be beset with undue pressure towards pleas of guilty. Current statistical data show that in our District Court criminal cases disposed of by plea are only 55% of the total disposed of by plea

---

6. THE CHALLENGE OF CRIME IN A FREE SOCIETY, *supra* note 3, at 134–136.

7. (Gov't Printing Off. 1966) at p. 384 *et seq.*

8. THE CHALLENGE OF CRIME IN A FREE SOCIETY, *supra* note 3, at 135.

or trial.[9] In all other U. S. district courts the percentage of dispositions is approximately 82% by plea.[10] Possibly this District's statistics are affected by the common law crimes prosecuted here by the United States Attorney, but I would be very much surprised if metropolitan prosecutors generally showed a lower percentage of guilty pleas. Again, I do not say that our condition is optimum. I merely say I see no indication here of an evil in our District that so cries out for remedy as to impel obiter discussions without benefit of adversary briefs and argument, empirical analysis of local conditions, or overview of the Judicial Conference or Judicial Council.

As to the particular case there is no evidence of plea "bargaining" by either prosecutor or judge even as to codefendant Alston who pleaded guilty. All that appears is that defense counsel advised Alston to plead guilty if he were in fact guilty because "his sentence would in all likelihood be lighter" (see *supra* note 2)—a generalized consideration which seems to me unobjectionable.

4. From the viewpoint of theories of analytical and functional jurisprudence I think I can follow what is meant by the observation of Judge Bazelon that the standards used by the prosecutors in bargaining as to lesser offenses, or dismissal of counts, are "as much a part of the law as the rules applied in court." But I certainly cannot follow to the conclusion that this reality makes the prosecutor's approach subject to court review in the same way as other legal decisions. That is indeed a leap that may plunge into rather than across an abyss. The same logic would lead the courts into review of police decisions to use admonitions in some cases and make arrests in others.

It is realistic jurisprudence to recognize that the police and prosecutor have the power to make law, in a real sense. It is equally realistic to recognize that the case system and judicial method are not a felicitous vehicle for survey and improvement of the administration of these officials, at least when what is involved is not the action in a particular case, but the array of actions taken across the board.

I do not say that egregious instances of abuse of police and prosecutional discretion may not be subject to review on constitutional grounds, as in cases where racial discrimination is a governing principle of administration. *Cf.* Yick Wo v. Hopkins, 118 U.S. 356, 68 S.Ct. 1064, 30 L.Ed. 220 (1886). Conceivably the development of doctrine as to the existence vel non of "voluntary" pleas conforming to Rule 11 of the Federal Rules

9. The percentage is obtained from 896/1610. The Data Provided by the Administrative Office of the United States Courts (Jan. 1969) show types of disposition for criminal defendants, excluding dismissals:

| | | |
|---|---|---|
| Convicted on plea or nolo | | 896 |
| Acquitted by—court | 93 | |
| —jury | 139 | |
| Convicted by—court | 27 | |
| —jury | 455 | |
| Disposed of by trial | | 714 |
| Total | | 1610 |

10. The percentage is obtained from 22055/26862. The Administrative Office data for fiscal 1968 show:

| | | |
|---|---|---|
| Convicted on plea of guilty or nolo contendere: | | 22,055 |
| Acquitted by—court | 484 | |
| —jury | 704 | |
| Convicted by—court | 1184 | |
| —jury | 2435 | |
| Disposed of by trial | | 4,807 |
| Total | | 26,862 |

of Criminal Procedure may lead to evolution of some judicial standards. But any extension of judicial doctrine along these or other lines for review of prospective actions should spring from actual cases and problems, should not be thrust forward in obiter expositions, but should await actual instances of arbitary prosecutorial actions brought before the court.

5. This brings me again to the D. C. Crime Report, to see whether the President's Commission, after investigation of the operation of the prosecutor's office, observed and brought to our attention some crying evil which shrieks out for attention, without regard to the disabilities that generally attend obiter discussion. The Commission was aware of, indeed it emphasized, the reality that the de facto authority of the prosecutor's

authority to dismiss or reduce charges gives him considerable power, "more control over individual liberty and public safety than any other public official." [11] Because of the prosecutor's "critical role in the administration of justice in the District of Columbia," said the Commission, the "work of his office has been discussed in detail." [12]

In its Evaluation of Prosecutive Discretion, we find first an emphasis on the importance of even-handed fairness in the prosecutor's performance. "It is in the area of no papers and dismissals that thousands of District residents find the quality of justice." And we find agreement by the Commission that in this respect the United States Attorney for the District of Columbia "has an exceptional record.[13] The Commission recom-

11. *See* D.C.Crime Report at 326:
"The prosecutor is 'the pivot on which the administration of criminal justice * * * turns.' Through his power to 'no paper' or dismiss cases he is the final arbiter in a wide range of criminal matters which never reach a judge or jury. Through his negotiation of pleas to lesser offenses he may limit the sentencing discretion of the court and ultimately determine the time within which correctional authorities can attempt to rehabilitate the accused. As a result he probably has more control over individual liberty and public safety than any other public official."
In support the D.C.Crime Report cited: NATIONAL COMMISSION ON LAW OBSERVANCE AND ENFORCEMENT, REPORT ON PROSECUTION, 11 (1931); NEWMAN, CONVICTION, 4–5, 197–230 (1966); Note, Prosecutor's Discretion, 103 U.PA.L.REV. 1057 (1955); Williams, Through the Looking Glass: The Office of the United States Attorney, 3 PRAC.LAW. 49 (1957); Moss, The Professional Prosecutor, 51 J. CRIM.L., C. & P.S. 461, 463 (1960); Note, Guilty Plea Bargaining: Compromise by Prosecutors to Secure Guilty Pleas, 112 U.PA.L.REV. 865 (1964); Cates, Can We Ignore Laws?—Discretion Not to Prosecute, 14 ALA.L.REV. 1, 6–8 (1961).

12. D.C.Crime Report, at 326.

13. *See* D.C.Crime Report, at 331–332:
"Equally as important as prompt prosecution is the prosecutor's exercise of

discretion. It is in the area of no papers and dismissals that thousands of District residents find the quality of justice. It should, to the greatest extent possible, be even-handed and fair. While the Commission recognizes the desirability of prosecutive discretion as a means of individualizing justice, we believe that inexperienced prosecutors need more guidance. The lack of such supervision and more formalized criteria has contributed to "assistant shopping" and the unnecessary referral of cases between the grand jury and the Court of General Sessions.
"The measure of a prosecutor's office is not entirely cases won, lost or not prosecuted. The office must conduct itself in a manner which enhances public confidence in the law and which plainly demonstrates a just system for moving against the offender and clearing the innocent. In this respect the United States Attorney's office in the District of Columbia has an exceptional record. Renovation of its offices in the Court of General Sessions Division is one example; witnesses and others coming in contact with the judicial process no longer obtain an impression of indifference and carelessness because of poor physical facilities and congestion. New procedures for screening and reviewing the 14,000 citizens' complaints, encouraged and supported by the United States Attorney, suggest the beginning of a long overdue effort to reserve the courts for important criminal matters and to channel to the

mended some improvements—an increase in staffs and salaries for the prosecutor's office; and a system of more instruction, guidance and review of young assistants. But there is not a whisper of a diagnosis that the substantial prosecutive discretion and authority analyzed by the Commission was plagued with ailments that would be aided by injection of judicial blood.

6. Insofar as Judge Wright's opinion joins in Judge Bazelon's, it is subject to the same comments. Where the opinions differ, Judge Wright's may reflect a more realistic approach, but I hesitate to explore the point because of my basic conviction that we should not be engaged at this time in discourse in dicta on broad matters not focused by the trial record and the adversary process, and not made the subject of the overview available from discussion at the Judicial Council or Judicial Conference.

7. I had originally ended my opinion with what has gone before. On rereading I feel impelled to add a thought as to how I visualize the line for improvement of judicial administration.

Society's interests in both justice and public order would be served by improvement of sentencing approach—general sentencing standards, procedures for application to specific cases, the optimum method of considering guilty pleas and no contests. Few would quarrel with that simple statement. Few would stand content with the often scattershot and contradictory techniques and judgments now in effect, with the permutations of different legislative provisions and acts of judicial discretion.

My objection to the opinions of my brethren today is not a negativistic shrinking from the problems. It rather reflects the conclusion that essentially we are faced with a problem for judicial administration rather than rules implemented by specific appellate case rulings.

It is not easy to know how the judiciary should proceed, and there are important underlying questions of policy that will require legislative attention.

Advisory sentencing councils were explored by the Executive Session of the Judicial Conference of this Circuit. The cognizant committee concluded that the proposal would consume time and effort that would impair the district court's over-stretched ability to handle the mounting criminal case load.

In May 1967, our Conference accepted the committee's recommendation that this circuit proceed instead by holding a sentencing institute. Authority was duly obtained from the United States Judicial Conference. On November 22 and 23, 1968, this circuit had the benefit of an excellent Sentencing Institute, planned and chaired by Judge Spottswood Robinson. There would be value, I think, in other sentencing institutes in due time.

Advisory sentencing councils may be ripe for reconsideration. The field is in flux and time has not stood still. The Sentencing Institute had the benefit of the views of Chief Judge Joseph C. Zavatt, advocating advisory sentencing councils and recounting the experience of the Eastern District of New York.

Since 1967 there have been changes in our District Court's procedures, including the rotation of sentencing on guilty pleas. Wisdom may be garnered from the experience of the cadre of district judges specially assigned to the cases that arose from the ashes of the fires and looting of April 1968. Pains are being taken to move with utmost feasible dispatch in the processing of this bulge of prosecutions that skewed and threatened to undermine the criminal calendar. Yet the district judges concerned have rightly taken time to consult on common criteria for sentencing, informally rather than by formal councils, but none the less significantly.

Further analysis may also profit from the experience of the Court of General Sessions, which in May 1968 adopted

proper agencies those essentially social problems associated with low-income urban life in the District of Columbia."

a resolution authorizing advisory sentencing councils, on an optional basis, for the civil disorder cases.

Advisory sentencing councils are only one procedure. Other techniques can be developed. Some way can be devised to coordinate with the prosecutor's role.

The approach, however, is best sought on a broad basis, with substantial consensus among the active circuit and district judges. This approach may be more slow than one would like, but I think it will be more sure and meaningful, in impact on offenders and prospective offenders, than the kind of appellate jurisprudence contemplated in the opinions of my brethren. I also think it is more likely to evolve effectively if the district judges focus together on their prime responsibility, at least under existing conditions, without the sense of being mandated and perhaps hampered by such a jurisprudence.[14]

14. Compare Powell v. Texas, 392 U.S. 514, 536–537, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968).