**UNITED STATES of America ex rel.
Arnold CLEVELAND, Petitioner,**

v.

**J. Leland CASSCLES, Superintendent of
Great Meadow Correctional Facility,
Comstock, New York, Respondent.**

**No. 72 Civ. 2586.**

United States District Court,
S. D. New York.

Jan. 17, 1973.

Howard L. Ganz, New York City, for petitioner.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, for respondent; Michael Colodner, Asst. Atty. Gen., of counsel.

## OPINION

FRANKEL, District Judge.

Petitioner seeks the federal writ of habeas corpus on the asserted ground that his ten-year state sentence, following a guilty plea, was adjudged under a misapprehension of fact so vital and prejudicially influential—and so casually accepted, over a protest, from unexamined hearsay—as to violate his right to the due process of law. For reasons hereinafter stated, this court concludes that petitioner must be resentenced.

In 1969 a New York grand jury indicted petitioner and a co-defendant on a number of charges arising from the robbery and stabbing of a woman on a New York City street. On October 15, 1970, the co-defendant pled guilty to a Class C felony, for which he was later sentenced to a term of five years. Four days later, having been confined since June 10, 1970, the petitioner entered a plea to a higher crime, the Class B felony of first-degree robbery, "to cover the indictment." On December 8, 1970, after the sentencing of his co-defendant, petitioner was sentenced to ten years' imprisonment.

Given the huge discretion of sentencing judges and the 25-year maximum petitioner faced upon his guilty plea, there are facts in the state record which, if they stood alone, would wholly insulate against federal (or, probably, any) attack the sentence of which complaint is here made. Petitioner was sentenced for a more serious offense than the one to which his co-defendant had pled. Petitioner's criminal record appears to have been more serious. His plea "covered" an outstanding narcotics charge as well as the robbery. The sentence imposed was well within the maximum.

■ Notwithstanding all this, the state record is too flawed to pass the test of the Fourteenth Amendment. The sentencing judge accepted and stressed a hearsay report that petitioner, after taking the victim's property, had needlessly and wantonly stabbed her. This "fact," if it was one, had an obvious and appropriate place in the sentencing decision. However, as was repeatedly indicated to the state judge, petitioner never admitted the stabbing; on the contrary, refusing to tender any such admission, defense counsel made reasonably (if not vividly) clear that petitioner would want to contest any such assertion if it was to be considered against him. In such circumstances, the hearsay report was worthless. It should have been rejected or put to at least some minimal test of its accuracy. However this blot is to be erased, it cannot remain—the State ought scarcely to wish it to remain—to deface and impair a judgment of imprisonment for ten years.

At the time of petitioner's guilty plea on October 19, 1970, the prosecutor described the charges against petitioner as follows:

> "MR. SCHMUKLER: The defendant in this case, Your Honor, is accused of robbery in the first degree, because, as the indictment charges, on October 9, 1969, while acting in concert with a Hugh Robinson, he robbed a Mrs. Yuet Ling Lee, *and during the course of that robbery, this defendant stabbed Mrs. Yuet Ling Lee, and her pocketbook was taken from her."* (Emphasis added.)

Thereafter, in the course of an expeditious voir dire, the judge asked if petitioner was pleading voluntarily, was told "Yes," then proceeded as follows:

> "THE COURT: And do you admit to the fact that on October 9, 1969, in New York County, you forcibly stole certain property from a lady named Yuet Ling Lee consisting of U.S. currency and personal property having a total value of about $18, and that in the course of the commission of this crime you used a sharp object which, in this case, was a knife, stabbed Mrs. Lee and caused serious physical injury; do you admit this?

> "MR. CHANCE: Judge, may I approach the Bench just a minute with the district attorney on that point?

> "(Mr. Schmukler and Mr. Chance approach the Bench and engage the Court in an undertone discussion which is had off the record.)

> "THE COURT: Do you admit this and that at the time Hugh Robinson, the co-defendant, was present? Do you admit this?

> "(Mr. Schmukler and Mr. Chance approach the Bench and engage the Court in an undertone discussion which is had off the record.)

> "THE COURT: All right, I'm going to rephrase it. Don't expunge what I said from the record, however.

> "After conferring with the assistant district attorney and Mr. Chance, I'm going to ask you this question: Do you admit to the fact that on October 9, 1969, in New York County, you forcibly stole certain property from a woman named Yuet Ling Lee?

> "THE DEFENDANT: Yes.

> "THE COURT: And at that time you were acting in concert with the defendant Hugh Robinson?

> "THE DEFENDANT: Yes.

> "THE COURT: And this property had an aggregate value of about $18 consisting of United States currency and personal property, and that in the course of the commission of this theft the stealing of property from Mrs. Lee, a knife was used which resulted in Mrs. Lee being stabbed and causing her to sustain personal injuries. Do you admit that?

> "THE DEFENDANT: Yes."

As explained by petitioner, with entire plausibility and without contradiction, the redacted questioning reflected that petitioner refused to admit the stabbing. Evidently accepting that im-

portant limit upon the confession of guilt, the court allowed the plea without it. If the matter had ended in that posture, the present petition would be short work.

Some seven weeks later, however, at petitioner's sentencing, the alleged stabbing reappeared and played a seemingly prominent role. Again, defense counsel sought to have the allegation put to one side. But this time the effort, which could perhaps have been more vigorous and lucid, did not avail. Petitioner's supposed role as wielder of the knife appears to have been a significant, if imponderable, factor in the sentence.

After a brief plea by defense counsel for "extreme mercy" and some talk of an *outstanding narcotics charge*, the prosecutor proceeded to urge that the court

"ought to impose a substantial portion of the twenty-five years that Your Honor may impose in a case such as this. The reason I ask for such a sentence, because when this crime was committed, Your Honor, it was a crime which involved the taking of a pocketbook forceably from a Chinese lady who had just dropped her children off at a nursery downtown. After the pocketbook had been taken by Mr. Cleveland's co-defendant and after this man fled with the pocketbook this defendant, and for no purpose whatever, stabbed this woman, requiring hospitalization for some period of time. This was information which I received from a witness who was standing within feet, in fact, had been in conversation with the defendant and his co-defendant prior to the robbery and saw everything quite clearly so she reports to me. It's my feeling, Your Honor, that this defendant stabbed this woman and did it for no purpose whatever, and in light of the psychiatric report which indicates that this man is unethical, I suggest, Your Honor, that this man is a sociopath and is not fit to remain in our society and I ask Your Honor to im-

pose the sentence of from five to fifteen years.

"THE COURT: What are you doing, asking me to put him away for almost the rest of his life?

"MR. SCHMUKLER: No, Your Honor, from five to fifteen years.

"THE COURT: What sentence are you recommending?

"MR. SCHMUKLER: I'm recommending a sentence in this case from five to fifteen years."

The prosecutor went on to observe that the petitioner's record was worse than the co-defendant's. Then the colloquy proceeded:

"MR. SCHMUKLER [assistant district attorney]: In addition, Your Honor, the other defendant had not taken part in the stabbing.

"MR. CHANCE [defense counsel]: In drawing that distinction it is very discriminating and the position that he actually took was that because this man had used the knife.

"THE COURT: I certainly think the man who uses the knife is entitled to more.

"MR. CHANCE: That's not my point, Judge.

"THE COURT: He's earned it.

"MR. CHANCE: My point is he would not be entitled to that vast distinction that he recommends. What you do I don't know. If it goes to that depth there should be a hearing on the question of whether or not his statements the District Attorney has told you are hearsay or true, that he deliberately stabbed her or somebody told him who watched him stab her. I think that's important. That's ten years difference he's recommending.

"THE COURT: Well, very frankly, I'm not going to comply with your recommendation. I'm not going to comply with his recommendation. I'm willing to listen to both of you but, of course, I make up my own mind and I also am guided by the advice of the

probation department. The victim was hospitalized for three days. I'm not saying this to minimize the crime but it wasn't a serious wound, although again I want to repeat, I'm not excusing this defendant in any way. The record does show though that he has a record, although he's only 24 years old, in 1962 he was placed on probation as a delinquent child for accosting two young boys and stealing money from them. October, 1962, he was sent to New York State Training School for violation of probation. February, 1964, probation was terminated unfavorably. Then he was sentenced to the New York City Reformatory for possession of stolen property in March of 1964. In April, 1964, he was sentenced to the New York City Reformatory, received a suspended sentence for assault. April, 1966, he was involved in the unauthorized use of criminally receiving and using an automobile. Received six months. Either he was lucky or he had a good lawyer up to this point.

"MR. CHANCE: Probably had the same lawyer.

"THE COURT: You weren't his lawyer were you? You couldn't be that good. April, 1966, violation of parole, New York City Reformatory. June, 1967, he was sentenced to the work house for four months for assault in the third degree. June, 1967, same date, he received concurrent sentence for another crime. This October he has reached his pinnacle by actually not only robbing this lady but also stabbing her, and there doesn't seem to be any mitigating circumstances for the stabbing. It was after the robbery was completed.

"Under the circumstances, I'll sentence the defendant, Arnold Cleveland, to an indeterminate term of ten years in the State Prison and remand him to the State Department of Correction."

In considering the validity of the sentence thus imposed, we find ourselves in one of the most unsettled and unsettling provinces of the law. See United States v. Waters, 141 U.S.App.D.C. 289, 437 F. 2d 722, 723 (1970). Sentencing and its sequellae—prison, probation, parole, and other forms of "treatment"—have finally come to be recognized as subjects for rational thought and for scrutiny under tests of "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions." Gideon v. Wainwright, 372 U.S. 335, 343–344, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), as quoted in United States v. Malcolm, 432 F.2d 809, 815 (2d Cir. 1970).[1] The trend of the law is plainly toward the importation of standards of order and decency into quarters where elementary safeguards have been singularly absent. Among the most obvious of such safeguards is the provision of some reasonably reliable procedure for ascertaining and testing factual propositions that may weigh heavily in setting the totals of months or years for which people will be confined.[2]

We would not allow damages for a crushed fender to be measured upon such casual hearsay as was permitted in the state record before us to "establish" the brutal stabbing for which petitioner has been assessed some indeterminate part of 10 years in prison. Whatever uncertainties and inconsistencies appear to confront a district judge reviewing the controlling law, it seems clear by now that a judgment like the one in question here cannot stand.

There is square authority in petitioner's favor. United States v. Sheppard, 149 U.S.App.D.C. 175, 462 F.2d 279, 280 (1972); United States ex rel. Brown v.

1. See, e. .g., A.B.A. Project on Minimum Standards for Criminal Justice, Sentencing Alternatives and Procedures (Approved Draft, 1968), and Appellate Review of Sentences (Approved Draft, 1968), and citations collected in those useful works.

2. See, e. g., Sentencing Alternatives and Procedures, *supra*, §§ 4.4(c), 4.5(b), 5.3 (d), 5.3(f), and 5.4(a).

Rundle, 417 F.2d 282, 285 (3d Cir. 1969); United States v. Myers, 374 F.2d 707 (3d Cir. 1967). It is probably sufficient to recall the clear and unqualified pronouncement of our Circuit in United States v. Malcolm, 432 F.2d 809, 816 (1970):

> "Misinformation or misunderstanding that is materially untrue regarding a prior criminal record, or material false assumptions as to any facts relevant to sentencing, renders the entire sentencing procedure invalid as a violation of due process."

Buttressing the cases most closely in point, there is the highest authority for principles pointing toward the same result. Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948), is distinguished by respondent because the constitutional wrong there found was, as respondent says, "twofold—(1) misinformation which could have been corrected by producing the defendant's criminal record and (2) the lack of counsel who could have produced such a record." [3] This reading of *Townsend* is acceptable enough, but it scarcely serves to lead where respondent would take us. Townsend (as petitioner says was true of him as well) "was sentenced on the basis of assumptions * * * which were materially untrue." 334 U.S. at 741, 68 S.Ct. at 1255. To be sure, this happened to Townsend "while disadvantaged by lack of counsel," *id.* at 740–741, 68 S.Ct. at 1255 whereas petitioner here had counsel. But the ultimate point about counsel (or the lack of any) was that "Counsel, had any been present, would have been under a duty to prevent the court from proceeding on such false assumptions and perhaps under a duty to seek remedy elsewhere if they persisted." *Id.* at 740, 68 S.Ct. at 1255. It was "the services which counsel would provide," *id.* at 741, 68 S.Ct. at 1255— namely, adversary testing of hurtful assertions of fact—which made the lack of counsel important. See United States v. Myers, *supra,* 374 F.2d at 710. Here, where counsel was present and demanded such a test, the evil in the end is the same. Surely, the overborne defendant at the sentencing bar should not be permanently denied a remedy because the "duty" imposed for his benefit proved ineffectual in its performance, whether because the court simply erred or because defense counsel was less strident than he might have been.[4]

Mempa v. Rhay, 389 U.S. 128, 135, 88 S.Ct. 254, 257, 19 L.Ed.2d 336 (1967), extending the right to counsel at any sentencing proceeding, however labeled, again lists as the first and paramount need "the aid of counsel in marshaling the facts * * * [and] introducing evidence of mitigating circumstances * * *." The valuable right thus assured becomes a mockery if adversary procedures in which counsel can function may be simply ignored or held unavailable.

As respondent stresses, it remains true, if to an uncertain degree, that the sentencing proceeding need not embody all the steps and techniques of a trial. Specifically and understandably, respondent invokes the continued authority of Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), for the point that hearsay information in a presentence report could

---

3. Memorandum of Law in Opposition to Petition for Writ of Habeas Corpus 4.

4. The state transcript seems to make perfectly clear that defense counsel said "there should be a hearing" to test the "hearsay" about the "stabbing" if that alleged wounding was to be weighed in the sentencing. If this may be doubted, petitioner's assigned counsel now says (as a suitably tentative and for-the-sake-of-argument footnote), the petitioner's allegations could come literally within *Townsend* by being read to charge "the denial to petitioner of his right to the effective assistance of counsel." The court adopts this analysis in its entirety, beginning with, and stressing, that there is no occasion to condemn defense counsel's efforts as "ineffective" any more than we ever so characterize a lawyer whose sound arguments are erroneously overridden by the trial judge.

constitutionally serve as part of the basis for a sentence to death rather than life imprisonment. Apart from its age, quite considerable in a context like this, *Williams* is comfortably distinguishable. It did not involve a specific, sharply identified, contested issue as to the nature of the crime itself. It mainly concerned the sentencing judge's use of the probation report for broad biographical facts, including matters revealing the defendant's outlook, tendencies, and personality. "The accuracy of the statements made by the judge as to appellant's background and past practices was not challenged by appellant or his counsel, nor was the judge asked to disregard any of them or to afford appellant a chance to refute or discredit any of them by cross-examination or otherwise." *Id.* at ˙244, 69 S.Ct. at 1081. Noting the kind of diffuse subjects on which Williams sought a full-scale trial, the Court observed that our rules of evidence "have been fashioned for criminal trials which narrowly confine the trial contest to evidence that is strictly relevant to the particular offense charged." *Id.* at 247, 69 S.Ct. at 1083. Such a subject for "trial contest" happens, of course, to be the precise question of fact mooted here. By that same token, the issue before us is not, as was true in *Williams,* one that calls for such a "type and extent of \* \* \* information [as would] make totally impractical if not impossible open court testimony with cross-examination." *Id.* at 250, 69 S.Ct. at 1084. In sum, read in its full setting, Williams v. New York does not justify the procedure and resulting sentence here assailed.[5]

We are left, to be sure, with seams and asymmetries in the law of sentenc-

ing. If the judge may not rely upon *disclosed* propositions that are disputed, what prevents him from simply refraining from disclosure? One way to avoid criticism and reversal for wrong reasons is "giving no reason at all." Williams v. New York, *supra* at 252, 69 S.Ct. 1079. And how seemly is it for a federal *nisi prius* judge to hold invalid a state sentence for denial of an opportunity to contest adverse allegations when we still, as of now, claim discretion to withhold the contents of presentence reports? See Fed.R.Crim.P. 32(c)(2). But see Preliminary Draft of Proposed Amendments to Fed.R.Crim.P. 32(c), 52 F.R.D. 451 (1971). See also United States v. Picard, 464 F.2d 215 (1st Cir. 1972); United States v. Janiec, 464 F.2d 126 (3d Cir. 1972). In addition to questions like these (and kindred others omitted for brevity's sake), there are difficult problems of knowing in detail (a) when due process may require evidentiary hearings and (b) how closely such hearings must approach the full panoply of a trial.

■ Leaving such problems for fuller time and much-needed scholarship, this court offers only some initial suggestions:

(1) It is familiar, in sentencing as elsewhere, that disclosed reasons may expose errors that would have passed unknown and uncorrected but for the disclosure. E. g., Scott v. United States, 135 U. S.App.D.C. 377, 419 F.2d 264, 266–267 (1969); Thomas v. United States, 368 F.2d 941 (5th Cir. 1966).

(2) The consequence, at least for agonizing subjects like the imposi-

---

5. Somewhat ingeniously, respondent fashions a sword from the decision in United States v. Tucker, 404 U.S. 443, 447, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972), holding invalid a sentence rested, *inter alia,* upon information concerning two prior convictions where defendant had not had counsel, because this was held to be "misinformation of constitutional magnitude." The misinformation here, it is argued,

was of lesser "magnitude." If this species of label mattered, something could be said under Thompson v. Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960), about the finding of a stabbing based upon no competent evidence. But the more fitting response is that *Tucker,* though stood upon its head, does not stand for anything helpful to respondent.

tion of sentence, ought to be more disclosure, not less. None of us whose business it is to seek justice have any proper interest in arranging that injustices be kept from view.

(3) It is neither necessary nor proper for a court of first instance to attempt wide pronunciamentos. It is sufficient for today's case to say that a clear issue of fact material to the sentence may not be resolved finally on hearsay where the defendant seeks and is denied (or is not effectively offered) an opportunity to contest the assertion.

Thus, this court does not presume to specify the precise nature or extent of the hearing petitioner should have had, and must now have, on the issue as to the stabbing. It may be said, if not decisively, that the question seems one suitable for familiar forms of evidentiary contest. It is appropriate, nevertheless, to leave the fashioning of an adequate proceeding to the state tribunal entrusted with the power and responsibility for the just sentencing of this petitioner.

██ For the reasons, and upon the terms, above stated, the petition is

granted. Petitioner will be released from confinement unless the State proceeds within sixty days to have him resentenced in accordance with this decision. It is so ordered.[6]

The court notes finally, but importantly, its appreciation for the devoted and effective scholarship of Howard L. Ganz, Esq., as assigned counsel for the petitioner.

---

6. In an effort to avoid any possible ambiguities, and to make entirely certain that we are dealing with a genuine claim of injury rather than an abstraction, cf. H. Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U.Chi.L.Rev. 142 (1970), the court raised with petitioner the question whether he unequivocally (and under oath) was denying in this proceeding that he was the person who had wielded the knife in the criminal episode. The petitioner on December 20, 1972, made such an affidavit. Reacting to that document, the Attorney General suggests that this assertion of innocence with respect to the knifing aspect "should properly be addressed to the State sentencing court as the basis for a motion for resentence." (Letter of January 4, 1973.)

As this opinion has shown, however (and respondent has never disputed), petitioner raised in the state court, at both his plea and sentencing, the issue as to whether the reported stabbing by him was "hearsay or true." Cf. note 4 *supra*. To remit him now (after the State has resisted so strenuously) to a "motion for resentence" would trivialize what we enshrine as the Great Writ. Moreover, except for this last-minute suggestion, there has never been any claim of failure to exhaust state remedies. Petitioner has pursued such remedies through the State's appellate courts. His clear and limited contention has never been in doubt. Its merits have been contested in extensive state briefs.

Finally, the Attorney General's thought does not seem momentous as a practical matter. The result reached today leads to a state resentencing hearing. Though this is more than a "motion for" such a hearing, it is not so much more as to be a grave concern. The aim of all the procedures is to reach a decision on the merits of the claim that petitioner's sentence was, or may have been improperly affected by a serious factual error.